Vincent Mosby H29851
P.O. Box 689 F-307L
Soledad, CA
93960-0689
Petitioner Pro-se

FILED
MAR 19 2008
RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND

original

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| Vincent Mosby, Petitioner, v. ANTHONY P. KANE, WARDEN, Respondent. | C07-4216 SBA (PR)<br>PETITIONER'S NOTICE OF MOTION AND MOTION IN OPPOSITION TO RESPONDENT'S NOTICE OF MOTION AND MOTION TO DISMISS; SUPPORTING MEMORANDUM OF POINTS AND AUTHORITIES<br>District Judge:<br>The Hon. Saundra B. Armstrong |

PLEASE TAKE NOTICE that Petitioner Vincent Mosby, Petitioner in Pro se, moves this Court to deny Respondents Motion to dismiss Petitioner's habeas petition on the grounds that Petitioner has followed the rules of this Court in filing his Pro se petition, and that Petitioner has exhausted his state court remedies, that he has stated sufficient facts which if true would entitle him to relief, and that his habeas form petition issued by this court must be read "generously". A hearing is requested if necessary to resolve this matter. This motion is based on the notice and motion, the

supporting memorandum and points and authorities, the petition for writ of habeas corpus on file with this court, the state court decisions and Board hearing transcripts attached hereto, and other such matters properly before this Court.

**MEMORANDUM OF POINTS AUTHORITIES**

**INTRODUCTION**

Petitioner Mosby is a California state prisoner being unlawfully held at the CTF-Soledad State prison, proceeding pro se in the above entitled action. In his habeas corpus petition Petitioner alleges numerous violations of his Constitutional rights under the 5th, 6th, and 14th Amendments to the United States Constitution. Specifically, as was exhausted in the California Supreme Court Petitioner alleged he was denied federal due process of law and his protected liberty interests, insufficiency of the evidence claims, a right to have the charges made by the Board to be submitted to a jury, Biasness, Equal Protection of the law, and Vagueness challenges (See Pet. 6A-6D.)

Petitioner stated the "operative facts" of his claims and in fact cited case law in support of those facts both in the Petition for Review in the California Supreme Court and in this Court. Petitioner provides to this Court for purposes of showing the Court that Petitioner has indeed properly exhausted his state court remedies and also provides a copy of his parole hearing transcripts which is also being sent to Respondents along with the California Supreme Court's denial of the Petition for Review. Accordingly the Respondents must comply with this

Courts Order as directed in its Order to Show Cause, dated January 17, 2008.

ARGUMENT

I.

PETITIONER ALLEGED FACTS WHICH IF TRUE WOULD ENTITLE HIM TO RELIEF AS IS CLEAR FROM THE COURT'S ISSUANCE OF AN ORDER TO SHOW CAUSE WHICH IS WELL WITHIN THE COURT'S JURISDICTION

Respondent alleges that Petitioner's claims are couched in conclusory allegations without "sufficiently plead" facts. (See Resp. Not. Mot. & Mot. to Dismiss & Mem. of P & A pg. 3), and thereby suggests that this Court has no jurisdiction to issue an order to show cause on claims that on their face clearly appear to have merit. Repondents would like for this court to dispose of Petitioner's liberty interest, his due process rights, and other clearly established rights just because he is not versed in pleading federal habeas corpus petitions. Petitioner submits that all that is required is that he legibly state facts which if true would entitle him to relief. None of the cases cited by Respondents hold that a pro se petitioner has to present all of the facts on a habeas corpus form petition.

In its January 17, 2008 order, this Court obviously bore in mind, as is required by U.S. Supreme Court authority and as Ninth Circuit Precedent demands, that "petitions must be read in context and understood based on the particular words used," Peterson v. Lampert, 319 F.3d 1153, 1159 (9th Cir 2003) (en banc), and that "pro se [habeas] petitions are held to a more lenient standard than counseled petitions." Sanders v.

Ryder, 342 F.3d 991, 999 (9th Cir. 2003) cited in Davis v. Silva, 2008 DJDAR 33, at 34 order issued January 2, 2008 (9th Cir.), when it issued the **Order to Show Cause** where this Court wrote "It does not appear from the face of the petition that the petition is without merit," (See Order to Show Cause issued by this Court on January 17, 2008 on file with this Court)

Respondents are obviously confusing subject matter jurisdiction of the court with a failure to state a cognizable or colorable claim which this Court has clearly rejected by issuing its order requiring the Respondents to answer. Clearly this Court has subject matter jurisdiction over Petitioner's habeas corpus claims pursuant to 28 U.S.C. §2254. Federal question jurisdiction exists if the complaint (or petition) purports to state a claim under federal law regardless of the validity of the claim. Wheeldin v. Wheeler, 373 U.S. 647, 83 S.Ct. 1414, 144. 10 L.Ed.2d 605 (1963). Only if the stated claim is so wholly insubstantial that even a preliminary review of the merits is not required does the federal court not have jurisdiction. Bell v. Hood, 327 U.S. 678, 66 S.Ct. 773, 90 L.Ed. 939 (1946). It is not every arguably failed claimed that deprives the district court of jurisdiction. Here, Petitioner properly invoked §2254 when he used the habeas corpus form issued by this Court. (See this Courts' own Habeas Corpus forms on file with the Clerk) Petitioner's contentions that he was denied due process and other federal constitutional rights in the parole context are not so insubstantial so as to deprive this Court of jurisdiction to issue an Order to Show Cause on the merits

from the face of the claims of the pro se petition form wherein Petitioner stated the "operative facts" of his claims. Respondents assertions are clearly misdirection from the claims. Had Petitioner not pleaded sufficient facts for the Court to issue and Order to Show Cause this Court would not have done so.

Petitioner does not have to meet any burden of proof to Respondents at this point but rather to this Court. Respondents claim that Petitioner provided no documents or evidence however, as will be seen below, there is no requirement that he present documentary evidence in order to state a colorable claim on the habeas corpus form that Petitioner used from this Court. Therefore, the Petition should be granted and the Order to Show Cause must stand.

II.

PETITIONER HAS EXHAUSTED HIS STATE COURT REMEDIES THE STATE MUST ANSWER THE SHOW CAUSE ORDER BECAUSE PETITIONER PROVIDED THE COURT WITHTHE OPERATIVE FACTS OF HIS CLAIMS

Respondents claim that Petitioner has the burden of proving that he exhausted his state court remedies before filing his federal petition. (See Resp. Not Mot. & Mot. to Dismiss; Mem P & A pg. 4) The State cites Darr v. Burford, 339 U.S. 200, 218-19 (1950), and Fay v. Noia, 372 U.S. 391, 435 (1963) for this proposition. Petitioner submits however, that he must bear his burden of proof to this Court, and not to Respondents, it is up to this Court to decide whether or not the petition states a prima facie case and whether or not the petition appears on

its face to have merit. Petitioner, to further prove that he has in fact "exhausted" his state court remedies has attached to this opposition motion his Petition for Review which includes the State Apellate Court, and Los Angeles Superior Court decisions, and further, Petitioner attaches a copy of his parole hearing transcripts for Respondents edification. Exhaustion does not require a "habeas Petitioner ... present to the state court every piece of evidence supporting his federal claims in order to satisfy the exhaustion requirement." Chacon v. Wood, 36 F.3d 1459, 1469 n.9 (9th Cir 1994). See Davis, supra, at p. 34.

Petitioner has not "failed" as Respondents have claimed, to exhaust his state remedies. Petitioner submits that if counsel for Respondents had followed protocol like Deputy Attorney Generals are supposed to do she would have ordered Petitioner's file and transcripts and used them in her Lodgment of documents like Deputy Attorney Generals do in all other cases concerning parole matters. Each time Petitioner filed in the state Courts, he provided the Office of the Attorney General with a copy of the petitions, had counsel for Respondents done an cursory investigation she would have found that Petitioner in fact had exhausted his state court remedies as well as his federal claims in state court by indicating "the federal law basis for his claims by citing in conjunction with the claims the federal source of law which he relies or a case deciding such a claim on federal grounds, or simply labeling the claim 'federal'" Davis v. Silva, (9th Cir. 2008) DJDAR 2008 33, 34, citing Baldwin

v. Reese 541 U.S. 27, 32 (2004); See also Insyxiengmay v. Morgan, 403 F.3d 657, 668 (9th Cir. 2005)(Stating that the petitioner makes the federal basis of his claim explicit by either specifying particular provisions of the constitution or stautes, or by citing to federal law). Therefore Petitioner presented to this Court as well as the Highest State Court with all "the facts necessary to state a claim for relief" Davis, supra, Id. at 34, citing Gray v. Netherland, 518 U.S. 152 162-163 (1996). In Picard v. Connor, 404 U.S. 270, 275, the Supreme Court has held that the exhaustion requirement is not satisfied unless the federal claim has been "fairly presented" to the state courts." Here, Petitioner has done so. (See Petition of Review and cases cited therein attached hereto).

The California Supreme Court in its denial of Petitoner's Petition for Review denied the petition without any citation to any case with the following words "The petition for review is denied". The California Supreme Court did not cite any case referring to a procedural defect nor did the court make a ruling on the merits of Petitioner's federal claims rejecting those claims, therefore the Court must use the "look through rule" and analyze the petition under the standard of §2254 (d). See Ylst v. Nunnemaker, 501 U.S. 797, 804, 111 S.Ct. 2590, 115 L.Ed. 2d 706 (1991)

In Harris v. Superior Court, 500 F.2d 124 (9th Cir. 1974) (en banc), cert. denied 420 U.S. 973, 95 S.Ct. 1354, 43 L.Ed. 2d 652 (1975), the Ninth Circuit held: "If the denial of the habeas corpus petition includes a citation of an authority which

indicates that the petition was procedurally deficient ...,
then the available state remedies have not been exhausted as
the California Supreme Court has not been given the required
fair opportunity to correct the constitutional violation." Id.
at 1128. As stated above, the California Supreme Court did not
cite to any case denoting a procedural deficiency and its denial
of his federal claims requires the Court to look through to
last reasoned decision that denied the federal claims which
was the Los Angeles Superior Court, however, this must take
place after a full briefing of the issues.

Respondents go on to claim that Petitioner does not cite
any case numbers to verify any identifying information, but
admits that Petitioner alleged that he filed petitions in the
state courts. (See Resp. Mot. Not. to Dismiss& Mem & P & A pg.
4) Petitioner submits that he is an U.S. citizen untrained in
the law and entitled to the protections of the U.S Constitution.
Petitioner has claimed a violation of his Constitutional rights.
He is proceeding pro se and per the Local rules of this Court
L.R. 2254 -3 (2)(e) has used the habeas corpus form that this
Court provides. (Petition HC-6-02. wpd). Nowhere on the habeas
form does it indicate to unwary prisoners such as Petitioner
to include a case number where it does not ask for this to be
done, it merely asks for the name of the court. (See Pet. at
pg. 4-5) Nowhere does it state that a pro se petitioner has
to attach any documents or evidence. Petitioner believed that
he could provide all of this when he submitted his Traverse
to Respondents answer as the habeas form does not state that

these things are required as they make no mention of these documents needing to be attached to the petition. (See Pet. pg 5-6) Despite Respondents claim that Petitioner did not cite any clearly established federal law (See Resp. Not. Mot. & Mot. to Dimiss Mem P & A at pg. 40), this was a wreckless assertion because not only has Petitioner listed a number of clearly established U.S. Supreme Court cases and other authorities on page 7 of the petition as is required by the petition, he has listed numerous citations in his Petition for Review in the California Supreme Court. (See petition for review attached hereto)

Petitioner should not be faulted because he is an "unwary pro se petitioner". He followed the instruction on this Court's habeas form to the letter as far as he understood them. The United States Supreme Court has held that the exhaustion requirement is not intended to "trap the unwary pro se prisoner". Slack v. McDaniel, 529 U.S. 473, 487 (2000). The High Court has also held pro se hearings to a less stringent standard than briefs and pleadings filed by trained counsel, and reads pro se pleadings generously, "however inartfully pleaded." See Haines v. Kerner, 404 U.S. 519, 420 (1972) See also Davis v. Silva, supra, (9th Cir.) 2008 DJDAR, p. 34 "petitions must be read in context and understood based on the particular words used," citing Peterson v. Lampert, 319 F.3d 1153, 1159 (9th Cir. 2003) (en banc) and that "pro se [habeas] petitions are to be held to a more lenient standard than counseled petitions." Sanders v. Ryder, 342 F.3d 991, 999 (9th Cir. 2003) Davis, Id.

CONCLUSION

It is unfortunate that so many indeterminately sentenced prisoners such as Petitioner whom are minorities and poor are unable to retain adequately trained counsel who have a working knowledge of parole law, however Petitioner like so many others are being forced to file habeas petitions on their own without any formal training and with very limited resources or meaningful access to the prison's law library due to lockdowns and severe overcrowding. The habeas form that was issued by this Court does not say to attach any documentation, exhibits, evidence etc., instead it says to "Briefly state every reason that you believe you are confined unlawfully." It was within this Court's jurisdiction to liberally construe the habeas form petition and to issue the Order to Show Cause on January 17, 2008. While Respondents are trying to take adavantage of Petitioner's somewhat inatrfully plead petition, this Court has stated in its issuance of the Order to Show Cause: "It does not appear from the face of the petition that it is without merit." (underline added for emphasis). This Court did not say that there was anything wrong with the habeas corpus petition it provides let alone made any mention of a need for Petitioner to attach documents of any nature. Petitioner strongly believes that Respondents counsel is either trying to stall due to a heavy case load or trying to delay justice in this matter. It has already been 3 years since the hearing in question and justice delayed is justice denied. Petitioner should not have to languish in prison forever because of some perceived mistake

by the Respondents. Petitioner has stated claims for relief in his habeas corpus form petition by including references to specific constitutional guarantees, as well as a statement of the facts that entitle him to relief. (Gray, supra, 515 U.S. at 162-63.) Petitioner has in fact established a prima facie showing as is evident by this Court's January 17, 2008 Order to Show Cause and Respondents must comply with this order. Petitioner has no other recourse of law save by Federal Petition For Writ of Habeas of Corpus. For the foregoing reasons the Writ should issue, and Respondents motion to dismiss Denied

Respectfully Submitted,

Vincent Mosby
Petitioner Pro se

Date: March 17, 2008

Court of Appeal, Second Appellate District, Div. 5 - No. B197463
**S151950**

# IN THE SUPREME COURT OF CALIFORNIA

**En Banc**

---

In re VINCENT MOSBY on Habeas Corpus

---

The petition for review is denied.

SUPREME COURT
FILED

JUN 20 2007

Frederick K. Ohlrich Clerk

DEPUTY

GEORGE

Chief Justice

IN THE SUPREME COURT OF THE

STATE OF CALIFORNIA

S151950

In re

VINCENT MOSBY

on Habeas Corpus.

State Court of Appeal
Second Appellate District, Division 5
Case No. B197463

Los Angeles Superior Court
No. BH003842)
(Steven Van Sicklen, Judge)

PETITION FOR REVIEW

SUPREME COURT
FILED
APR 1 9 2007
Frederick K. Ohlrich Clerk
DEPUTY

VINCENT MOSBY
H-29851
P. O. BOX 0689
SOLEDAD, CA 93960-0689

SUPREME COURT OF CALIFORNIA

In re:

VINCENT MOSBY,

On habeas corpus. /

Case no. ______________

Sup. Ct. no. BH003842

App. Ct. no. B197463

PETITION FOR REVIEW

AFTER DENIAL IN THE CALIFORNIA COURT OF APPEALS, SECOND DISTRICT; WHICH DENIAL WAS FILED ON 4/11/ 07

TO: HONORABLE CHIEF JUSTICE RONALD GEORGE AND THE ASSOCIATE JUSTICES OF THE CALIFORNIA STATE SUPREME COURT IN SACRAMENTO, CALIFORNIA

## INTRODUCTION

Vincent Mosby, (petitioner), hereby lodges this Petition For Review with this honorable Court after denial in the Second District Court of Appeals, Division Five. A copy of that denial is attached hereto as Exhibit "A". Petitioner is seeking to settle important questions of law and secure privileges to which he is entitled under statutory authority and that are fully embodied in both state and federal Constitution's rights pertaining to, but not limited to: Due Process, Equal Protection, and the adequate representation of petitioner's interests during proceedings which respondents have initiated. This is of no small import inasmuch as respondents are the sole provider of the guarantees of which petitioner seeks to avail of in order to attempt to reclaim his liberty interests and release from custody or to have his Hearing reheard with instructions to the panel.

Respondents are not only the sole providers of these guarantees but, by virtue of their position, have sway over the methods and quality of the legal, ethical, and judicious assurance of those rights to comport with federal due process guarantees which have become part and parcel of our legal fabric.

## DISCUSSION

Petitioner is an inmate at Correctional Training Facility, Central Facility (CTF-C), in Soledad, California, where he is serving a fifteen (15) years-to-life term for murder of the second degree, Penal Code (PC) §187, an additional one (1) year for a principle in the offense who used a firearm PC § 12022 (a), after conviction in the Los Angeles County Superior Court. Petitioner is not challenging his conviction in the within action and for the purposes of this matter accepts the decision of the Los Angeles County Superior Court, notwithstanding his longstanding and viable claims in his direct appeal which are not being addressed nor argued herein.

QUESTIONS PRESENTED

1. Does Petitioner's state and federal constitutional rights to due process and equal protection become violated by respondents when they deny to him the individualized considerations mandated and required by statutory authority and all the clearly established laws?

2. Are Petitioner's federal rights to due process and equal protection violated when respondents utilize a lesser standard of legal proof which requires evidence with some indicia of reliability to find Petitioner unsuitable to parole and therefore an unreasonable risk to the public safety although contrary to the professional testimony?

3. Does petitioner's federally-cognizable liberty interests in release to parole created by respondent's statutory scheme and mandatory language of the enabling statute that requires a suitability finding under statutory criteria prevail when respondents "substantial evidence" burden of proof is not met herein by any standard relying on U.S. SUPREME Court case law?

NECESSITY FOR REVIEW

In this case, the Board of Prison Hearings (BPH) refused to set a parole release date, relying on PC §3041(b). This Court's decision in In re Rosenkrantz (2002) 29 Cal.4th 616, and more recently in In re Dannenberg (2005) 34 Cal.4th 1061, do not appear to establish any limits to the BPH and/or governor whatsoever as to the use of the offense to deny parole in almost all meritorious cases that come before it.

Does PC §3041(b) then, allow the BPH or the governor to convert offenses for which the statutes create a presumption of suitability and term setting at the Minimum Eligible Parole Date (MEPD), into express Life-Without-Parole sentences at their discretion? In a similar fashion, can the California Code of Regulations (CCR), title 15, §2402(c), be used in perpetuity to deny parole, based on only those enumerated circumstances and factors specified in the Regulations focused on, despite the overwhelming and incontrovertible evidence of suitability and lack of danger to the public as expressed in the term matrices? In this case, the Board of Prison Hearings (BPH) refused to set a parole release date, relying on PC §3041(b), based on the reasons that the Board believed the "motive for the crime was "trivial" in relation to the offense, § 2402 (C)(1)(E). This court's decision in In re Ronsenkrantz, (2002) 29 Cal.4[th] 616, and more recently in In re Dannenberg 34Cal.4[th] 1061 do not appear to establish any limits to the BPH and/or governor whatsoever as to the use of the offense to deny parole in almost all meritorious cases that come

before it.

May the BPH's and/or governor's lay opinions and standard-less assessment of the gravity or the motive for the offense disregard a jury's and/or court's determination? Does the "trivial motive" language in section 2402 (C)(1)(E) have anything to do with the gravity an offense i.e., is it synonymous with it, or does it allow the Board to rely on it alone to make the offense "especially heinous, atrocious or cruel", or is it standardless or unconstitutionally vague? Does such an interpretation of the statutes violate rules of statutory construction and unlawfully deprive petitioners of a state and/or federal liberty interest in parole release?

In reviewing the BPH's and/or governor's decisions, does the "some evidence" standard of review preclude meaningful judicial review for more than pro forma consideration as opposed to consistent due consideration? Moreover, is the "some evidence" standard an unreasonable application of U.S. Supreme Court authority, given the obvious qualification as stated in Superintendent v. Hill (1985) 472 U.S. 445, when the hearings are not "exigent circumstances"?, and where the evidenced is overlooked by a biased official? (See Edward v. Balisok, 520 U.S. 640.) Does Petitioner have a right to a fair and impartial hearing, and a right to be free from arbitrary and capricious and biased government action? Withrow v. Larkin, (1975) 421 U.S. 35; 43 L.Ed. 712; 95 S.Ct. 1465; Schweiker v. McClure, (1982) 456 U.S. 188, 72 L.Ed. 2d 1; 102 .Ct. 1665; Wolff v. McDonnel, 418 U.S. 539, 558 (1974); Yick Wo v. Hopkins, 118 U.S. 356, 369 (1886).)

Petitioner therefore respectfully requests that this Honorable Court and the Justices thereon grant this Petition For Review with a view towards settling important matters of statewide importance, affecting thousands of similarly-situated inmates. And, further, to consider whether or not federal constitutional laws have been violated by respondents and/or their agents of the Executive branch, i.e., BPH staff, California Department of Corrections and Rehabilitation, named or unknown, et al.

## POINTS AND AUTHORITIES

## ARGUMENT

### Ground 1.

THE BPH'S REFUSAL TO SET PETITIONER'S PAROLE RELEASE DATE, BASED ON THE EVIDENCE PRESENTED, UNLAWFULLY DEPRIVED HIM OF A CONSTITUTIONALLY-PROTECTED STATE AND FEDERAL LIBERTY INTEREST.

A. California's Statutes Give Rise To A Liberty Interest Protected By The Due Process Clauses Of California And U.S. Constitutions.

It has been long established that California's parole statutes contain sufficient substantive predicates to give rise to a constitutionally-protected liberty interest. McQuillon v. Duncan (9th Cir. 2002) 306 F.3d 895; Biggs v. Terhune (9th Cir. 2003) 334 F.3d 910; citing U.S. Supreme Court authority: Wolff v. McDonnell (1974) 418 U.S. 539;

Greenholtz v. Nebraska Penal Inmates (1979) 442 U.S. 1; Board of Pardons v. Allen (1987) 482 U.S. 369.

Pursuant to PC §3041 and rules of statutory construction authority petitioner respectfully requests that, if possible, every word and clause of a statute SHALL be given effect. This becomes crucial where the statutory scheme mandates that parole release dates are normally to be set at the ***initial*** parole hearing which SHALL be held one year before an inmate becomes eligible. And, construed as closely to its actual meaning as is legally possible where, one year prior to the MEPD, an inmate SHALL have a parole release date set at that time in a manner that will provide for uniform terms based on certain criteria specified by statute and/or regulations as indicated by the matrices of similar crimes, and a date for parole may only be withheld if the BPH makes a reasonable determination that an extended period of incarceration is required in the interest of public safety due to the gravity of the current convicted offense, and/or the gravity and timing of a past offense. There can be no doubt here that the Board has engaged in a general policy of denying parole at the **initial** and continues to deny parole even beyond that point by citing immutable factors that a prisoner cannot change to find an inmate "unsuitable" parole. This is not "no parole"policy claim as the Board has granted some parole dates but only after many years after the "initial" hearing. Rather this is a Bias claim and an unlawful policy claim.

Suitability determinations may not be arbitrary, capricious, or whimsical. The evidence relied upon must tend logically and by reasonable inference to establish facts relevant to suitability unless a factual determination is made of unsuitability. In re Morrall (2002) 102 Cal.App.4th 280, 298-99. Furthermore, that evidence must bear some indicia of reliability. Jancsek v. Oregon (9th Cir. 1987) 833 F.2d 1389, 1390. CCR, title 15, §§ 2402 and 2281 set forth the criteria and general guidelines implementing the parole statutes and provide standards in making that determination. (See footnotes to Regulations, citing as authority PC §§ 3041, 3052, and 5076.2).

Petitioner asserts that the hearing officers at his December 8, 2005 hearing were biased and predisposed to find against him. The Board was presided by Chairman Susan Fisher, who is a long time member and former Executive Director of The Doris Tate Crime Victims Bureau, as well as other established special interest victims right organizations. These victim rights groups oppose any one convicted of murder being granted parole. The appointment of these type of individuals on the Board is hardly representative of a cross-section of California's population. The California Legislation has attempted to advance the cause of fairness and impartiality in the Board of Prison Terms (now the Board of Prison Hearings) to prohibit the appearance of "bias" by the passage of Penal Code Section 5075. The Board panel which denied Petitioner parole date was comprised in abrogation of the Legislative intent and a violation of the Constitutional requirements of impartiality. Penal Code 5075 states: "...The selection of persons and their appointment by the governor and confirmation by the senate shall reflect as much as nearly

possible a cross-section of the racial, sexual, economic, and geographic features of the population of the state. (emphasis added).

The composition of the Board has excluded all but a homogenous group of mostly white, former law enforcement officials, and special interest groups who have vindictive motives, and whom are economically better off than the average Black citizen such as Petitioner as well as the average citizen in California. For these reasons Petitioner submits that the representational defect in the Board is pervasive and structural and make every judgment it makes suspect. However, the "actual bias" that occurred at the hearing resulted in an arbitrary and capricious decision being made based on political whim and caprice. (See In re Powell, (1988) 45 Cal.3d 894)

Due Process requires that each applicant receive a fair hearing before a fair tribunal. Withrow v. Larkin, 421 U.S. 427. This applies to administrative agencies which adjudicate as well as to courts. Gibson v. Berryhill, 411 U.S. 544; Morrisey v. Brewer, (1972) 411 U.S. 471, 33 L.Ed. 2d 484; 92 S.Ct. 2539. Not only is a biased decision maker unacceptable, but "our system of law has always endeavored to prevent the probability of unfairness" In re Murchinson, supra, citing Tumey v. Ohio, 273 U.S. 510 "The neutrality requirement helps guarantee that life, liberty, or property will not be taken on the basis of erroneous or distorted conception of facts or the law. (Citation) At the same time, it preserves both the appearance of fairness, generating the feelings so important to a popular government, that justice has been done (Citation), by ensuring that no person will be deprived of his interests in the absence of a proceeding in which he may present his case with the assurance that the arbiter is not predisposed to find against him." Marshall v. Jerrico, (1980) 446 238; 64 L.Ed 2d 182; 400 S.Ct. 1610

In this case Petitioner could not present his case as the evidence he proffered was see as "minimizing" his "role" in the offense because Petitioner introduced "mitigating" evidence at the hearing into the administrative record and the Board panel used language that applied to a person who actually did the killing.

Bias exists where a court or administrative agency or court has "prejudged, an issue." Partington v. Gedan, 880 F.2d 116 (9th Cir. 1989), as quoted in Kenneally v. Lundgren, 967 F.2d 329, 333 (9th Cir. 1992) Such a tribunal is incompetent as it effectively provides no opportunity to litigate contested claims. Gibson, supra, 411 U.S., at 577.

California Courts have also determined "...[l]y matters not whether there is actual bias, appearance of bias being sufficient." In re Marriage of Iverson, (1992) 11 Cal.App.4th1495, 1505; Cf. Catchpole v. Brannon, (1995) 36 Cal.App.4th 245, 248. Both the appearance of bias and "actual" bias" occurred in this case as pointed out in the habeas petition. There can be no doubt, that the biased, vindictive, and arbitrary decision made to deny Petitioner parole by Susan L.. Fisher, was based on her political and personal whims and caprice and denies prisoners like Petitioner a right to a fair and impartial hearing. Petitoner was denied the opportunity to have discovery and an

evidentiary hearing on these issues.

B. The Parole Statutes Impose An Affirmative Obligation On The Board To Set Release Dates; The Regulations Implement Those Statutes.

The trial court in this case erred when it alllowed the Board to inexplicably and unjustifiably use the exception in P.C. 3041 (b) to swallow the rule that parole shall normally be granted. Petitoner's role in the offense can in no way be said to be "more than the minimum necessary to sustain a conviction for the offense". The offense committed by a cohort was not "especially heiinous, atrocious or cruel" to justify the dparture from P.C. 3041 (a), there was not any evidence in the record with an indicia or reliability of that Petitoner would pose an unreasonable risk to pyblic safety if released at this time. The decision was arbitrary and capricious and violated Petitioner's Due Process and liberty interest rights protected tby the U.S. Constitution's 5th and 14th Amendments.

The BPH's regulations pursuant to PC §3041(b), state a prisoner may only be found unsuitable if the BPH determines that the offense or past (convicted) offenses and present timing is of such gravity that a longer period of incarceration is required in the interest of public safety. The determination is made based on the standards set forth by the BPH's regulations. The principle guidelines in making the determination is CCR §2402(c), et seq., which, as is the Matrix, are now well-known to this Court. (A copy of those specified criteria are attached as Exhibit "B".)

As will be noted at Exhibit "B", Circumstances (1), (2), and (4) of CCR §2402(c), arguably reflect the subset of allowable exceptions in the criteria to setting parole release dates; the current or past offense(s). Factor (E) of subsection (1), however, is a rare circumstance as there is almost always as here, an explanation as to why the offense occurred. Whether the motive truly was trivial or inexplicable is another matter that, as one court noted, has a somewhat illusory acceptance:

> "The epistemological and ethical problems involved in the ascertainment and evaluation of motive are among the reasons the law has sought to avoid the subject. As one authority has stated, "hardly any part of penal law is more settled than that motive is irrelevant." [Hall, General Principles of Criminal Law, (2nd ed.1960) at p.88; see also Husak, Motive and Criminal Liability (1989) vol.8, No.1 Crim. Justice Ethics 3.]"

The court further explained:

> "The offense committed by most prisoners serving life sentences is, of course, murder. Given the high value our society places upon life, there is no motive for unlawfully taking the life of another human being that could not be deemed 'trivial'". The Legislature has foreclosed that approach; however, by declaring that murderers with life sentences must "normally" be given release dates when they approach their Minimum Eligible Parole Dates (MEPD). PC §3041(a)." In re Scott, (Scott I) (2004) 119 Cal.App.4th 871, 892-93. (governor's rescission of parole unanimously reversed, Scott II (2005) 133 Cal.App.4th 573; 34 Cal.Rptr.3d 905. Review/De-publication denied 12-2-05; see: attached copy of Dec. 2, 2005, Los Angeles edition of the Daily Journal, p. 13803, attached hereto as Exhibit "C").

It is therefore questionable whether the factor has any evidentiary value in this case. If the motive was indeed inexplicable, "A person whose motive for a criminal act cannot be explained or is unintelligible is therefore unusually unpredictable and dangerous." (Scott I, p. 893.) Such is certainly not the case presented here and warrants close scrutiny by this Court. No where did the Board articulate the poper standard when denying petitoner a set parole date. The Board was required to find that : "The prisoner committed the offense in an especially heinous, atrocious or cruel manner " CCR tit. 15 2402 (C)(1). However, the Board only cited a reason that has nothing to do with the actual act itself, and that was committed by someone other than Petitioner, and instead relied solely on the "motive" of a crime partner and gave no "individual consideration" to Petitioner and his role in the offense.

Justice Moreno's Dissent in Dannenberg illustrates just what is lacking in the present judicial interpretation of the statutory language and is notable because, as was written there:

> "There is, as the majority notes, a tension between P.C. § 3041, subdivisions (a) and (b). But [t]he function of the court in construing a statute 'is simply to ascertain and declare what is in the terms or in substance contained therein, not to insert what has been omitted, or to omit what has been inserted; and where there are several provisions or particulars, such a construction is, if possible, to be adopted as to give effect to all.' (CCP, § 1858). Ventura County Sheriffs' Assn. v. Board of Retirement (1997) 16 Cal.4th 483, 492. The majority fails to perform this basic function, **reaching its result by ignoring or discounting much of section 3041.** (emphasis added to original).

The primary circumstances and factors considered when making the determination, CCR §§2402(d)(1)(B) and (D), have been explained by the courts. To qualify for the authorized exception, an offense must be exceptionally egregious or especially grave.

The Court of Appeals characterized this as follows:

> "In re Van Houten (2004) 116 Cal.App.4th 339, illustrates the sort of gratuitous cruelty required. The prisoner in that case was involved in multiple stabbings of a woman with a knife and bayonet. While she was dying, the victim was made aware her husband was suffering a similarly-gruesome fate. As stated by the court, "'[t]hese acts of cruelty far exceeded the minimum necessary to stab a victim to death."' (Id. At p. 351) Other examples of aggravated conduct reflecting an "exceptionally callous disregard for human suffering", are set forth in BPH regulations relating to the matrix used to set base terms for life prisoners (§2283, subd. (b)); namely, "torture", as where the "[v]ictim was subjected to the prolonged infliction of physical pain through the use of non-deadly force prior to the act resulting in death", and "severe trauma: as where "[d]eath resulted from severe trauma inflicted with deadly intensity; e.g., beating, clubbing, stabbing, strangulation, suffocation, burning, multiple wounds inflicted with a weapon not resulting in immediate death or actions calculated to induce terror in the victim." (Ibid., Scott I, supra, at p. 892.)

In this case there is no gratuitous cruelty or torture. An additional problem here is that the Petitioner never directly harmed the victim. Moreover, even in such exceptional cases, the matrix suggests appropriate "extended" terms. CCR §§2402(a), (b).

Circumstance (3) of the unsuitability factors: "Unstable Social History" is inapplicable where petitioner has

demonstrated stable relationships with others since incarceration, nor is there a nexus between pre-conviction history and current threat to public safety in this matter.

Circumstance (5), Psychological Factors. "The prisoner has a lengthy history of severe mental problems related to the offense.", is hardly ever a factor to be considered in most parole situations in Level II prisons and is not applicable at all in this case, as indicated by the latest professionally-accepted Psychological Report or by previous reports by very different doctors; mental health experts specifically trained to evaluate and report their analysis. Not one of these experts has found petitioner wanting nor in need of therapy, (which is nonexistent for mainline inmates without a reality-based, professionally prescribed and verifiable need.)

Circumstance (6), Institutional Behavior. "The prisoner has engaged in serious misconduct in prison or in jail." Perhaps, pursuant to CCR §2410, which provides for the granting or denial of 'post-conviction credit', it is reasonable to deny credit to indeterminately sentenced prisoners, but this factor should not be used to substitute for a statutory provision which specifies that **only** the **gravity** of the current or past *convicted* offense(s) could be grounds for withholding setting of a term, and **only** when the **gravity** is exceptional in light of PC §3041(a), that parole release dates should not **normally** be set. (emphasis added.)

Petitioner submits that the Legislature would not have specified that the **gravity** of the current or a past convicted offense could be a basis of denial if it had intended that the BPH has the broader discretion of PC §3041(b). Therefore, 'misconduct' or any other specious reasoning should not be used to deny parole **continuously**. As a point of fact, these same factors have been considered to be an "intrusion of irrelevant post-conviction factors in the determination of the punishment [that's] proportionate to the offense". In re Rodriguez (1975) 14 Cal.3d 639, 654-55, and those various cases following as its progeny.)

In a recent decision by Second District of Appeals, that court delineated a test where it held that "The test is not whether some evidence supports the *reasons* the Governor cited for denying parole, but whether some evidence indicates a parolee's release *unreasonably endangers public safety.* (Cal. Code Regs., tit. 15, section 2402 subd. (a) [parole denied if prisoner "will pose an unreasonable risk of danger to society if released from prison"]; see e.g. In In re Scott, (2005) 133 Cal.App.4th 573, 595, 34 Cal.Rptr.3d 905 ["The commitment offense can negate suitability [for parole] only if circumstances of the crime ... rationally indicate that the offender will present an unreasonable public safety risk if released from prison"] In re Lee, 49 Cal.Rptr.3d 931, at 936. That court also stated that "[s]ection 2402 sorts the factors relevant to assessing a defendant's risk into two categories: those that tend to show *unsuitability* for parole, such as an especially atrocious crime by the defendant and a history of violence; and those factors that tend to show *suitability*, such a lack of a criminal history, good prison behavior and remorse. (id at 936.) [underline

added].

C. The Board Of Parole Hearings Does Not Have The Almost Absolute Discretion It Had Under Determinate Sentencing And Should Normally Be Required To Set Parole Terms Within The Guidelines.

Notwithstanding that later decisions continue revising the interpretive gloss of the statutes and regulations, in 1982, immediately after the Determinate Sentence Law enactment and revised PC §3041were enacted in 1977, the newly enacted law was interpreted by this Court as follows:

> "Under the ISL, we previously viewed parole thusly: "'In the general field of criminal law the Legislature has abandoned infliction of fixed terms for certain crimes, and substituted the indeterminate sentence, leaving to the Adult Authority the judgment of the period of incarceration. The Adult Authority does not fix that period pursuant to a formula of punishment, but in accordance with the adjustment and social rehabilitation of the individual analyzed as a human composite of intellectual, emotional, and genetic factors." People v. Morse (1964) 60 Cal.2d 631, 642-43, (footnotes omitted.) ¶ In contrast, by altering the statutory scheme and enacting the Determinate Sentencing, the Legislature recited specifically that it "'finds and declares that the purpose of imprisonment for crime is punishment.'" (PC §1170(a)(1), all subsequent statutory references are to this code.) The new law provides that an inmate's "'release date shall be set in a manner that will provide uniform terms for offenses of similar gravity and magnitude in respect to their threat to the public, and that will comply with the sentencing rules that the Judicial Council may issue and any sentencing information relevant to the setting of parole release dates. **The BPH *shall* establish criteria for the setting of parole release dates** and in doing so *shall* consider the number of victims of the crime for which the prisoner is sentenced and other factors in mitigation or aggravation of the crime.'" (§3041, subd. (a), emphasis added.) The present parole guidelines were promulgated pursuant to the new Act. ***Thus, the guidelines are not mere administrative responses to the BPH's internal shifting discretion but rather reflect basic legislative alterations in the underlying parole scheme.*** " In re Stanworth (1982) 33 Cal.3d 176, 182. (**bold** *Italics* added.)

Stanworth noted, "Under both the 1976 [rules] and the current rules, a life prisoner must first be found suitable for parole before a parole date is set." (Id. At p.183.) However, the BPH's discretion in that respect has been limited, as in Montana:

> "**That the Montana statute places significant limits on the BPH's discretion is further demonstrated by its replacement of an earlier statute which allowed absolute discretion** ..." Allen, supra, at p. 369.) (**bold** emphasis added.)

In California, the former PC §3041, which granted the BPH's almost absolute discretion was replaced with the current one that specifies when and why the BPH may act. PC §3041(b) specifies that in consideration of public safety, with respect to the gravity of the offense or timing and gravity of a past offense, an extended period of incarceration may be required. Rules of statutory construction mandate that PC §3041(b) must be construed in context with PC §3041(a), and the mandate that parole dates ***shall*** normally be granted one year prior to parole eligibility, which occurs when the MEPD (minus good-time) has been served. "With respect to persons sentenced to indeterminate terms, the purpose of punishment is satisfied by the requirement of service of a minimum period before eligibility for parole ..." Morrall, supra, at p. 292. An "extended period of incarceration", then, is with reference to that

minimum "normal" term. The matrix guidelines provide suggested terms; some "extended" according to the gravity of the specified offenses, in complete accord with PC §3041 read as a whole.

The CCR's §§2282 and 2403 establish the circumstances and victim factors that suggest appropriate terms, but the same circumstances and factors are used instead to make unsuitability determinations of "inmate unsuitable" for parole release. Petitioner submits the guidelines have been, are being, and will be used in an unconstitutional manner. Practices like these have been condemned by Rodriguez, supra, and those condemned practices have resumed. Furthermore, the BPH continues invoking its discretion to disregard the reasonable execution of the statutes, refusing to normally set parole release dates. The Ninth Circuit has inferred that just such a practice could, or already may have, violate(d) due process:

> "The parole board's decision is one of 'equity' and requires a careful balancing and assessment of the factors considered. [cite] As in the present instance, the parole board's sole supportable reliance on the gravity of the offense and the conduct prior to imprisonment to justify a denial of parole can be initially justified as fulfilling the requirements set forth by state law. Over time, however, should [petitioner] continue to demonstrate exemplary behavior and evidence of rehabilitation, denying him a parole date simply because of the nature of [his] offense and prior conduct would raise serious questions involving his liberty interest in parole." Biggs, supra, at p.916, citing to Greenholtz.

The minimum statutory term for kidnap for ransom/robbery is seven (7) years; for second degree murder it is ten (10) years with credit reduction; for first degree murder it is sixteen (16) years (8) months with credit reduction. At the other end of the spectrum, the highest matrix on: kidnap for ransom/robbery is seventeen (17) years; second degree murder up to twenty-one (21) years; first degree murder at up to thirty-three (33) years.  According to Proposition 7, no one can change the mandatory minimum of "10 years for a Second Degree murder conviction except the People of the State of California, yet this salient point seems to be forgotten by the courts in California. The California Supreme Court in In re Jeanice D., 28 Cal.3d at 220 fn. 10 (1979), clearly explained that the minimum number of years required by a 15 to Life sentence under California Law, is **"10 years"** with good-time credits applied. As such, Petitioner's minimum eligible parole date, by statute, was April, 2001. (Proposition 7, and Penal Code Section 190 pre-1995) The board used the commitment offense to deny Petitioner parole  at his initial hearing in 2002, that was supposed to be held in 2001, and again in December of 2005, in which he has surpassed his minimum term to be served under California law  as set forth in Jeanice D.

The reasonable meaning of "early parole" is the **initial hearing** and the minimum eligible term, and extended terms logically are the highest matrix terms probably exceeding the normal terms due to "exceptional" offense circumstances, prior convictions involving violence, or substantial evidence of current dangerousness. More time could be exacted in accordance with CCR §2410, withholding "post-conviction" credit for failure to participate in self-help or similar programming, and/or avoiding available therapy, or for incurring (a) serious disciplinary infraction(s).

Such factors should not be continuously used indefinitely, however, to find unsuitability and certainly not BY ROTE!

In the watershed case opinion leading up to the enactment of the current Determinate Sentence Law (DSL) and PC §3041, the Court explained:

> "Prompt term-fixing will not only serve to alleviate one of those causes of anxiety now affecting inmates, but will also *prevent the intrusion of irrelevant, **post-conviction** factors in the determination of the punishment that is proportionate to the offense of the particular inmate.*" Rodriguez, supra, 654-55. (emphasis added to accentuate current parole system failure.)

Although the most recent interpretation of the statutes in Dannenberg, supra, now holds that proportionality or comparison of like offenses, as part of suitability determinations, is not required, the enactment of the DSL and enactment if PC §3041 was remedial for all similarly-situated inmates. (In re Neal (1980) 114 Cal.App.3d 141, 145.) Even if the state's interpretive gloss has changed, it is clear that because petitioner has a state and federal liberty interest vested by statute as determined by Supreme Court authority, the *constitutional* effect cannot be ignored:

> "While the interpretive gloss on the statute may bind this court as a matter of statutory construction, we are not, however, similarly bound as to the **constitutional effect** of that construction." (McSherry v. Block (1989) 880 F.2d 1053; Aponte v. Gomez (9th Cir.1993) 993 F.2d 705.) (emphasis added.)

The constitutional effect of the current interpretive gloss is that it deprives inmates of the remedial intent of the Legislative changes in PC §3041, and the vested liberty interest that parole dates were to be set one year prior to the eligible date. The words "shall normally" of PC §3041(a) have been omitted by the current construction of the statute section:

> "It is our duty 'to give effect, if possible, to every clause and word of a statute. Montclair v. Ramsdell (1882) 107 U.S. 147; rather than to emasculate an entire section, as the Government's interpretation requires." Minnesota v. Probate Court (1940) 309 U.S. 270, 277.

Lastly, the BPH has stated that the matrices do not apply unless and until an inmate is found suitable. Implementing PC §3041, the regulations state that the base term is to be set *solely* in accordance with the gravity of the offense. (CCR §2403(a).) The circumstances indicating the gravity, or seriousness, of offenses have been established by the matrices, yet the same circumstances and victim factors are used to find inmates unsuitable, continuously, as is "normally" done in virtually all cases.

> "It is simply irrational for [the] seriousness of the offense to be used first to determine the appropriate guideline period and then to be used again as the stated reason for confining a prisoner beyond that guideline." Little v. Hadden (1980) 504 F.Supp. 558, 562 (citing Lupo v. Norton (196_) 371 F.Supp 156, 163.)

The BPH's identical, and arbitrary, use of the Regulations is inconsistent with statutory language and unlawfully deprives similarly-situated inmates like petitioner of a vested liberty interest.

D. The Board's Decision Violates Apprendi/Blakely and Cunningham Rules And Has Employed Vague Language And Ambiguous Language Violating The 6th And 14th Amendments To The U.S. Constitution.

While the California Supreme Court has recently interpreted the parole statute and effectively the sentencing statutes in a manner that appears to undermine the standards previously established to provide like-terms, proportionality on Penal Code Section 190, and Penal Code section 3041 (a) In re Ramirez, (2001) 94 Cal.App.4th 549, at 570, ( this is the only aspect of Ramirez that was overturned by Dannenberg) . Petitioner contends that In re Dannenberg, (2005) 34 Cal.4th 1061, unlawfully destroys the plain meaning and intent of the sentencing statutes, the Legislatures intent, and the parole scheme, which is to provide proportionate like-terms for like crimes, under the Determinate Sentencing Act (DSA), or more commonly known as the Determinate Sentencing Law.

Penal Code Section 3041 et. seq., was specifically provided by the legislature to govern the manner in which term to life offenses were administered. The language that the length of terms are to be proportionately rendered is crystal clear in the plain meaning of the statute, and the Board and the legislature have adopted the matrixes Cal. Code, Regs., tit. 15 Sections 2280 and 2403 et. Seq., to provide a determinate sentencing scheme of like-terms for like crimes based on offense circumstances.

The determination of Petitioner's parole suitability is guarded by procedural and substantive protections that rise beyond the Dannenberg decision which basically require a multi level analysis in order to ensure Due Process and Equal Protection of the laws. Before considering the rudimentary sufficiency of the Board's findings , the analysis must focus of the question of whether the commitment offense can even be lawfully relied upon in this case to any degree in finding Petitioner unsuitable for parole based on his role in the offense. To the extent that the Board utilized terminology or elements of first degree murder, the Death Penalty, or Life Without the Possibility of parole to turn the crime into a "especially heinous, atrocious or cruel" (see P.C. Section 190.2 (a)(14) ) with "very trivial motive" Cal. Code. Regs., Section 2402 (C)(1)(E), their decision violates the rules of Appredi v. New Jersey, (2000) 530 U.S. 466; Blakely v. Washington, (2004) 542 U.S. 296, 159 L.Ed.2d 403, 124 S.Ct. 2531; Cunningham v. California (slip Opn. 2007) ; People v. Superior Court, (Engert) 31 Cal. 3d 798, 183 Cal.Rptr.800 (1980); See also Godfrey v. Georgia, (1980) 446 U.S. 420; 64 L.Ed 2d 398; 100 S.Ct. 1759; Maynard v. Cartwright, (1988) 486 U.S. 356, 100 L.Ed. 2d, 108 S.Ct. 1853.

Ground 2.

THE "SOME EVIDENCE" STANDARD AS APPLIED BY THE BPH'S PAROLE SUITABILITY DECISIONS IS AN UNREASONABLE APPLICATION OF PREVAILING U.S. SUPREME COURT AUTHORITY.

A. The "Some Evidence" Standard Militates Against The Reasonable Execution And Enforcement Of Applicable Statutes and Regulations As Decisional Law States.

Petitioner contends that because the language of PC §3041 together with the kidnap/murder statutes' minimum terms with time credits applied gives rise to a substantial federally-protected liberty interest which may not be abridged by the institutional "some evidence" standard of judicial review.

The administratively-imposed and judicially-sanctioned minimally stringent "some evidence" standard of judicial review of the Executive branch's decisions prevents a court from effectively safeguarding California prisoners' Constitutionally-protected state and federal liberty interests. This is so because, under the present standard, a court's review is limited to determining only whether "a modicum" of "some evidence" exists to support the BPH's finding of unsuitability and without substantial evidence or preponderance of the evidence standards as the guidepost, a court may not reweigh the evidence as it is proffered and thus, review will always fail to give appropriate respect to the Legislature's clear intent in establishing minimum terms. Cabling these defined standards together with parole statute language would fulfill the mandate that terms are "normally" to be set, ab initio.

Clear and convincing evidence demonstrates that the BPH and governors have failed to administer the statutes and regulations in a manner reasonably faithful to the plain language of PC §3041, granting only a mere token number of parole dates, the vast majority of which are reversed. The BPH's claim of almost absolute discretion and the "duty to give individualized consideration" to rationalize and justify the fact fails, as is shown below.

B. Differences Between Disciplinary Hearings And Parole Suitability Hearings Precluded The Application Of The "Some Evidence" Standard Does Not Offer Sufficient ProtectionTo Review The BPH's Parole Suitability Hearings.

Although the Ninth Circuit adopted the "some evidence" standard in Jancsek, supra, the issue there however, WAS NOT PAROLE SUITABILITY. And, this class of cases did not contemplate the qualitative nor quantitative differences in parole denial, which has a substantial evidence test and credit revocation, which only requires a preponderance of the evidence. The disparities in their results and magnitude of the respective deprivations, as Superintendent v. Hill advised with respect to the sufficiency of the evidentiary standard, should not be compromised.

Prison disciplinary proceedings often do involve "exigent" circumstances that require swift action on the basis of minimal or insubstantial evidence in the interests of prison operations and security, e.g., prevention of riots, assaults, retaliations, or punishing actions that might not be legally provable but reasonably certain to have occurred, similar to the Hill case. Disciplinary proceedings are due to serious rules violations, sometimes involving new

charges and court involvement. Disciplinary proceedings are very informal, usually involving only a correctional lieutenant conducting the hearing, and generally involving the loss of not more than six (6) months of credit, but oftener, just days or weeks. Credit loss can usually be regained after a certain period of good behavior, an incentive for better conduct, compliant programming, respect for staff; a legitimate and self-explanatory prison interest backed by all of the interested parties.

By contrast, parole suitability proceedings take place only after an inmate has become eligible for parole and has served a long period of incarceration sufficient to satisfy the MEPD requirement of the law. In the case of second degree murders, ten years is the minimum time required to satisfy statutory requirements. During that period, Also, participating in encounter groups such as Alcoholics Anonymous, Narcotics Anonymous, Anger Management and so forth, and generally maturing and staying out of trouble in expectation of receiving a parole in accordance with statutory language.

These hearings, if not as formal as court proceedings, are nonetheless very structured. Parole suitability hearings are scheduled with months (even years, due to systemic delays) of notice to judges, d.a.'s, victims or relatives of the deceased and/or their representatives, and other interested parties, as notice requires. An attorney is usually requested and appointed, the parole applicant is sworn in, put under oath, and hearings begin. One or two commissioners and a deputy commissioner conduct different aspects of the hearing, a deputy district attorney is usually present (via video-link) and may participate, ask questions, or make comments as asked through the commissioners. The entire proceedings are audio- and/or video-recorded, later transcribed and copies given to inmates and all concerned parties.

Qualitatively, then, parole suitability hearings do not involve "exigent circumstances", the qualifying consideration articulated by Hill. Reason dictates there are no day-to-day prison management interests at stake, unlike prison disciplinary proceedings. Quantitatively, parole suitability proceedings involve denial of parole for up two years, and after the 1994 Amendment to CCR §2270(d) for up to five (but compare §2268(b), §2400). These years of time, added in the "interests of public safety", cannot be restored nor replaced. Prison disciplinary proceedings generally involve the revocation of up to six months credit which can normally be restored after a disciplinary-free period and is normally granted at the first request.

The deprivation of parole for up to five years, multiple times, hardly seems comparable to a few month's credit loss, which, after restoration, puts an inmate in exactly the same position as before the infraction, unlike parole denial of many years, sometimes doubling the MEPD. These very significant differences illustrates why the High Court in Hill stated that the "some evidence" standard might not be constitutionally sound in "less exigent"

circumstances than those involved *in prison disciplinary proceedings*. (Id. at p.455, emphasis added.)

A more recent High Court case addressed a similar issue involving prison administration concerns. Sandin v. Conner (1995) 515 U.S. 472, like Hill, was also concerned with prison regulations, involving "... the language of intricate, often routine prison guidelines", and whether mandatory language of regulations created a protected liberty interest. (Id. at 480.) In Sandin, the Court retreated from its previous approach in Hewitt v. Helms (1983) 459 U.S. 460,(prison regulation regarding administrative segregation), in determining whether a prison regulation created a protected liberty interest, because the ruling in Hewitt has led to "undesirable effects."

The Court noted that Hewitt had "created disincentives for states to codify prison management procedures" and had led to the "involvement of federal courts in the day-to-day management of prisons." Sandin, supra, at p. 482-483. In its decision, the Court explained how, for prison administrators, more flexibility was "warranted in the fine-tuning of the ordinary incidents of prison life." Id. The rule adopted in Sandin was whether the action taken "imposes atypical and significant hardship(s) on the inmate in relation to the ordinary incidents of prison life.", in determining whether due process protections were implicated.

Thus, Sandin, like Hill, involved due process liberty interests with respect to prison regulations and management concerns. It is, of course, not a prison regulation pertaining to prison management or related prison disciplinary proceedings at issue in the present matter, but rather statutes governing parole release, protected by the Due Process Clause because a cognizable liberty interest has been created by statutory language. McQuillion, supra, at p. 902; Biggs supra, at p. 915.

The issue here is a statutorily-mandated proceeding to determine whether, after many years of programming-oriented incarceration, a prisoner's offense was of such exceptional gravity, or whether the prisoner's post-conviction conduct has been so demonstrative of unsuitability, that consideration of public safety requires extended periods of further incarceration beyond the minimum requirements of normal terms. (If structured proportionality wasn't contemplated by the Legislative branch at the time of the statute's initiation, why was a different term set for the crimes of first, second, and attempted murder, and kidnap for ransom/robbery, and why were specifically-graded recommended matrix terms established? Why is PC §3041(a) worded as it is?).

Although, as previously discussed, both loss of credit and denial of parole both affect the duration of the sentence, the magnitude of the deprivation is much greater when parole is denied after serving a lengthy term and more so when prisoners are repeatedly denied for up to five years, again. Also, because of the fact that no prison interests such as security, discipline or the like are involved, the Hill broadsword, like the Sandin rule, is wholly inappropriate. And, if anything, the "some evidence" standard has led to the necessity of federal court intervention

and involvement to review the BPH's decisions because state courts are limited to only reviewing for "some evidence" and almost universally refuse to find federal constitutional violations when confronted with patently obvious violations of the same. As such, the "some evidence" standard has "created disincentives" for the BPH to apply its rules in a manner comporting to federal standards of evidence or in any seemingly reasonable manner and thus requiring federal review. The "some evidence" standard of proof does not offer sufficient protection of prisoners liberty interest. The purpose of a standard of proof for a particular type of adjudication is to instruct the fact-finder on the correctness on the degree of confidence our society desires the fact-finder to have in the correctness of his or her conclusions. Addington v. Texas, 441 U.S. 418, 423, 60 L.Ed.2d 323, 99.C.t. 1804 (1979). The standard of proof "serves to allocate the risk of error between the litigants and to indicate the relative importance attached to the ultimate decisions." Id. The evolution of law has produced three basic standards of proof: preponderance of the evidence, clear and convincing evidence, and beyond a reasonable doubt. Id., at 423-24. Currently California uses a fourth standard of proof – "Some Evidence." This standard of proof is only supposed to be used by a reviewing court if the state itself has no standard of proof. However, the Board of Prison Hearings, which is an administrative tribunal, is required by its own regulations and that of the Office of Administrative Law, is to use the "Preponderance of Evidence" standard. The Board's regulations utilizes the preponderance of relevant and material evidence Section 2000(b) 50, [**Good Cause**]; 62 [**Material evidence**]; 90 [**Relevant Evidence**]. This standard for example allows a hearing officer to find that an inmate violated a disciplinary rile rule if there is some reliable evidence **presented to** show the prisoner committed the offense charged. This principle also applies to a parole hearing officer as this is the only standard of proof employed by the Board in its regulations. Thus, as a standard of proof, the "some evidence" standard is much less exacting than the preponderance of the evidence standard.

It must be noted that the "some evidence" standard of proof is not a standard of "review' when examining an administrative record developed after an adversarial proceeding . Hamdi v. Rumsfield, 542 U.s. 507, 124 S.Ct. 2633, 2651, 159 l.Ed.2d 578 (2004).

The Supreme Court addressed the "some evidence " standard in only with respect to disciplinary **hearings** in Superintendent v. Hill, 472 U.S. 445, 86 L.Ed. 2d 356, 105 S.Ct. 2768 (1985). In Hill, the Court held that the requirements of due process are satisfied if some evidence supports a decision by a prison disciplinary board to revoke good time credits. Id. at 445. The Court explained that "this standard is met if 'there was some evidence for which the conclusion of the administrative tribunal could be deduced.' Id. (citing Unites States ex rel. Vajtauer v. Comm. Of Immigration, 273 U.S. 103, 106 71 L.Ed. 560, 47 S.Ct. 302 (1927).

The Supreme Court used the following language in explaining the "some evidence' holding of Hill: *"Because*

*we conclude that due process demands some system for a citizen detainee to refute his classification, the proposed 'some evidence' standard is inadequate. Any process in which the Executive's factual assertions go wholly unchallenged or are presumed correct without any opportunity for the alleged combatant to demonstrate otherwise falls constitutionally short. As the Government itself has recognized, we have utilized the "some evidence" standard of review, not as a standard of proof *** that is , it primarily has been employed by courts in examining an administrative record developed after an adversarial proceeding – one with process at least of the sort that we hold today is constitutionally mandated in the citizen enemy – combatant setting. See [Hill]. This standard is ill suited to the situation in which a habeas petitioner has received no prior proceedings before any tribunal and had no prior opportunity to rebut the Executive's factual assertions before a neutral decisionmaker.*[11] Hamdi, supra, at 2651. (Emphasis added.)

Petitioner has to agree with the prevailing view and submits that Hill addressed only the appropriateness of "some evidence" as a standard of appellate review, not a standard of proof. The question is what is the appropriate fact-finding standard to be used by the Board. To determine whether a standard of proof in a particular type of proceeding satisfies due process, the U.S. Supreme Court has prescribed a three-factor test that examines: (1) the private interest affected, (2) the risk of an erroneous deprivation of such interest, and (3) the government interest. Mathews v. Eldridge, 424 U.S. 319, 335, 47 L.Ed. 2d 18, 96 S.Ct. 893 (1976).

It is clear that the first factor is satisfied as prisoners in California who have indeterminate sentences have a protected liberty interest in a presumed and expected parole date and supervised release. The Supreme Court has acknowledged that when an inmate has a liberty interest in good time credits, (See e.g. P.C. 190) he also has a strong interest in assuring that loss of his good time credits is not imposed arbitrarily because such a loss threatens his prospective freedom from confinement by extending the length of imprisonment. See Hill, 472 U.S., at 453. Here, as a direct result of the Board's determination that Petitioner is still dangerous by claiming that he is an "unreasonable risk" to public safety without any factual evidence of such a risk that he is currently so, and without standard of proof applied has lengthened his term of incarceration.

Under the second factor, the risk of erroneous deprivation of an liberty interest is high when the fact-finder uses the "some evidence" standard. By analogy, the Vermont Supreme Court carefully analyzed Hill, and concluded that Hill addressed the appropriate standard for judicial review of the actions of prison authorities rather than a proof necessary for a fact finder to conclude that an inmate violated a disciplinary rule. La Faso v. Patrissi, 161 Vt. 46, 633 A.2d 695, 697-98 (VT 1993). The Vermont court went on to state that "the safest reading of the Supreme Court's analysis is that Hill does not purport to resolve the question one way or the other." Id. at 698. The Vermont court in -

La Faso, noted: "It is difficult to conceive of an aspect of disciplinary procedure with a greater impact on the accuracy of fact-finding than the evidentiary standard on which the ultimate conclusion must be bases." Id. 633 A.2d, at 699.

Petitioner agrees, with the only difference being that it is applied here in the parole context. Under the "some evidence" standard, a fact-finder could conclude that the prisoner will pose an "unreasonable risk" to public safety if released even when the greater weight of the evidence indicates he is not. The fact-finder could reach this conclusion eve when significantly more than a greater weight of the evidence that the prisoner is not a threat to anyone. Thus, the use of the "some evidence' standard might result in the extension of many prisoners prison terms, especially where the prisoner in question has not committed any new crime and had behaved and rehabilitated him or herself showing they no longer pose a threat to anyone else. Under this standard of proof, the benefits of certain procedural safeguards provided by the Board's rules such as notice and opportunity to respond are of no value when the parole authority can extend an prisoner's term of incarceration for an alleged disciplinary offense etc., without showing that the prisoner's behavior in some ration way shows he is "currently too dangerous to be released", or when the balance of evidence fails to prove what the Board has alleged as "Cause" to deny Petitioner parole.

The third and final factor, the governments interest. In the Eighth Circuit Court of Appeals for instance, the court noted that the government has an interest in assuring the safety of inmates and employees, as well as avoiding burdensome administrative requirement that might be susceptible to manipulation. See Goff v. Dailey, 991 F.2d 1437, at 1441. But the government also has an interest in promoting fair procedures and the government derives no benefit from disciplining inmates who have committed no new offenses while rehabilitating themselves. The prison systems goals of preparing and rehabilitating prisoners for re-entry into society are better achieved if they have been treated fairly. Cf. for re-entry into society are better achieved if they have been treated fairly. Cf. McKune v. Lile, 536 U.S. 24, 36, 153 L.Ed. 2d 47, 122 S.Ct. 2017 (2002) (stating that rehabilitation is an important penalogical objective, and a prison program bearing a rational relation to that objective does not violate the privilege against self-incrimination as long as the adverse consequences an inmate faces for not participating are related to the program objectives and do not constitute atypical and significant hardships to the ordinary incidents of prison life.)

Petitioner submits that the "some evidence" standard sends the wrong message to prisoners as well as to society at large that once an individual is convicted of a crime, he is presumed guilty of every subsequent allegation by the Board. This is precisely the position the Board takes when it relies on factors a prisoner can't change to continually deny a prisoner parole, or when they use vague language which was not even found to be true at his trial and thereby violating the 6th and 14th Amendments to the U.S. Constitution. This message runs contrary to the fundamental principles of criminal in the United States of America.

Taking the Supreme Court's three factors into consideration, it should be concluded that the "some evidence" standard is inappropriate for use by the Board of Parole Hearings at the fact-finding level. Petitioner submits that the "Preponderance of the Evidence" standard better protects against an erroneous deprivation of a prisoner's liberty interest in his supervised parole release date and doe not pose an unacceptable burden on the Board as the "Preponderance of the evidence" burden of proof is already a part of the Board's own regulations, but has either been abused or misused.

Therefore, Board members must find by a preponderance of the evidence that a prisoner such as Petitioner (who never even directly assaulted the victim in this case) currently too dangerous to be released based on ration, reliable and relevant material evidence. ( See CCR tit. 15 Section 2000 (51))) [Good Cause]; (63) [Material Evidence]; and (91) [Relevant Evidence].) as "Cause" to deny Petitioner a parole release date. In the Board's regulations "Good Cause" is defined as : "A finding by the Board based upon a "preponderance of the evidence that there is a factual basis and good reason for the decision made." (emphasis added.), this standard of proof was not applied by the Board in this case and the decision to deny parole was arbitrary and capricious violating Petitioner's Due Process rights protected by the U.S. Constitutions Due Process Clause.

Even in the context of prison disciplinary proceedings, the High Court has explained that due process requires something more than "some evidence", and that this standard applies ***only*** to questions of evidentiary sufficiency as an additional requirement of due process, and "is not a substitute for other established due process requirements." Edwards v. Balisok (1997)520 U.S. 641, 648. As the Ninth Circuit has recognized, there will always be material that, under the "some evidence" standard, factors against a grant of parole:

> "[I]ndeed, 'some evidence of unsuitability for parole would exist in virtually ***every*** parole hearing, exposing every grant of parole to a BPH's subsequent change of heart or political whim." (McQuillion supra, at p.905; In re Caswell (2001) 94 Cal.App.4th 1017.) (emphasis added).

In Sandin, supra, the High Court expressly reiterated that "states may, under certain circumstances, create liberty interests which are protected by the Due Process Clause." Id. at 483-84, citing Allen, supra. Therefore, it is very clear that the Court did not mean to alter the rules set forth in Greenholtz and Allen with respect to liberty interests that a state's parole scheme may legitimately create. Logically neither, then, did Hill intend that it's "some evidence" decision there should apply to deprive petitioners of liberty interests created by state statutes. Petitioner submits that the application of the "some evidence" standard of review in the context of parole suitability determinations, where a vested liberty interest is at stake, is an unreasonable application of High Court authority and must fail:

> "Second, a state-court decision also involves an unreasonable application of this Court's precedent

if the state court either ***unreasonably*** *extends a legal principle from our precedent to a new context where it should not apply* or ***unreasonably*** refused to extend that principle to a new context where it should apply." (Williams v. Taylor (2000) 529 U.S. 362, 407; citing Green v. French (4th Cir.1998) 143 F.3d 865, 869-70.) (Emphasis added.)

Ground 3.

A. The BPH Unduly deprived Petitioner Of His Equal Protection Rights When it Denied Petitioner Parole Based On The Nature Of the Offense Without Consideration Of His Role Therein While Giving Other Prisoners Similarly Situated The Benefits Of The Law An Granting Them Parole Thereby Violating the Equal Protection Clause Of The 14th Amendment To The United States Constitution.

The Equal Protection Clause of the United States Constitution Amendment XIV, and California Constitution Article I, Section 7, and Article IV, Section 16, generally requires that the same means and methods be applied impartially to all persons or class of persons or other classes in like circumstances in their lives, liberty, and property and in their pursuit of happiness. People v. Wutzke, 28 Cal.4th 923, 123 Cal.Rptr.2d 447, 51 P.3d 310 (2002). In brief, equal protection of the law means the protection of equal laws. Wutzke, supra, Id.

A law that confers equal rights on all persons similarly

Situated with respect to such law, or subjects the Equal Protection Clause makes but one demand on the state: it must make, execute, and interpret its laws without unjust discrimination, and it must not grant to one which under similar circumstances it denied to another. it denied to another . Dooley v. Johnson, 133 Cal.App. 499, P.2d 540 (1st Dist. 1933) The equal protection provision requires that the state govern impartially, and all general rules that apply even handedly to all persons the jurisdiction unquestionably comply with this principle. Jones v. Helms, 452 U.S. 412, 101 S.Ct. 2434, 69 L.Ed2d 118 (1981)

Although persons similarly situated with respect to the legitimate purposes of the law must receive like treatment, the concept of equal protection of the law permits the state to provide differences so long as the result does not amount to invidious discrimination. People v. Jackson, 28 Cal.3d 264,; 168 Cal.Rptr. 603, 618; P.2d 149 (1980).

In order to constitute partiality and the invidious against which the Constitution aims, the denial of one of what is given to another must be on substantially, 41 P.3d 3 (2002) ([an invidious purpose for purpose for prosecution is one that is arbitrary and thus unjustified because it bears no rational relationship to legitimate law enforcement..)

Thus, although a law may be fair on its face and impartial in appearance, if it is applied and administered by public authority with an unequal hand so as practically to make unjust and illegal discrimination between persons in

similar circumstances , material to the rights of such persons, there is a denial of equal protections guaranteed by the Federal Constitution. Wayte v. United States, 470 U.S. 598 (1985); Yick Wo Hopkins, 118 U.S. 356, 65 S.Ct. 1064, 30 L.Ed.2d 220 (1886); People v. Schueren, 10 Cal.3d 553, 111 CR 129, 516 P.2d 833 (1973); City of Banning v. Dessert Outdoor Advertising, Inc., 209 Ca.App.2d 152, 25 CR 621 (4th Dist. 1962)

Wherefore, Petitioner asserts that he has been arbitrarily denied the equal protection of the laws. The Board has applied and interpreted the laws regarding parole matters in such a way that is discriminatory and invidious in regards to Petitioner based solely on his classification, while giving others whom are similarly situated and with similar circumstances, the benefit of those laws. Petitioner's crime was no where near the magnitude and egregious of cases like Rosenkrantz, and did not have the legal representation and the financial wherewithal to afford such representation such as he did, yet Ronsenkrantz, had each of his cases published. Petitioner cannot help but question as to why does an White, rich, prisoner who comes from an affluent family of wealth receive a parole date and released on parole, but Petitioner who is Black and poor, yet does not have the wealth and affluence like him or prisoners like in In re Scott II, supra., and who did not personally assault the victim in his case can receive a parole date but cannot is troubling. Petitioner submitted evidence of 21 similary situated prisoners whi have had their parole dates set and whose offenses could be considered "particularly egregious", or 'more than the minimum necessary ' to sustain a conviction for the offenses in those cases yet they were given the chance to be released on parole.

CONCLUSION

Here, then, the abiding question in this case is whether the evidence will reasonably support a conclusion that petitioner poses an unreasonable risk of danger or a threat to public safety, AT THIS MOMENT. Inherent in this idea of finding "suitability first" as the leading procedure, where the suitability determination precedes any consideration of the already-served term or lengthy period past the MEPD, must not devolve into casting a wide net with the unstated intention of denying all otherwise suitable inmates by reciting a mantra of "some evidence, suitability denied."

This, unfortunately, is essentially what has become the "normal" method currently utilized to deny parole-ready and suitability-worthy petitioners of any semblance of fair play and any court's acquiescence in this charade should be publicly aired and universally castigated as a political solution of the worst sort. Individual freedom is far too important to lie fallow in a politically-driven and inspired climate where such greater minds exist and have an imprimatur of trust.

Though a uniform term is based on historical facts, the issue as to whether petitioner is suitable for parole

must be based on whether the inmate is currently a threat to public safety and the state's experts should not be ignored where their opinions are in harmony with a suitable-to-release finding. The question must be asked, "Does the BPH or governor abuse it's discretion when they reject for the most specious of reasons, a professional Report based on an ethical expert's opinion that cannot be contradicted by a lay assessment of alternative 'facts'?" If the answer is "Yes.", then it is incumbent upon a Court of equity to review and, if necessary, reverse whatever damage has been done by these scurrilous attempts to circumvent the legal process and deny a worthy individual a second chance to succeed.

A second related question of importance is whether the "some evidence" standard for judicial review of parole suitability decisions can continue to be considered constitutionally-sufficient in light of the Sandin decision distinguishing liberty interests in the context of prison management and associated flexibility concerns and "the real concerns under girding the liberty protected by the Due Process Clause", citing Wolff, supra; Allen, supra. Sandin made it clear what Hill, supra, alluded to: that one is constitutionally permissible, but the other, not involving "exigent circumstances", is not. Hill, supra, at p.455. This is particularly so given statutory language vesting a liberty interest in the overall proceedings.

Petitioner respectfully requests review so that this Court may consider these questions of statewide and constitutional importance. Moreover, in light of Sandin, supra, and Irons v. Warden, to provide the Court with an opportunity to consider whether the denial by the court of appeals is an unreasonable application of established U.S. Supreme Court precedent and authority, an unreasonable application of law in light of the evidnce presented, thereby depriving Petitoner of a federal liberty interest protected by Due Process and Equal Protection Clauses of both state and federal Constitutions. This Court must now address these issues by way of Review, and issue an order directing the Court of Appeals to conduct an evidentiary hearing which was requested by Petitiioner but was denied in that Court based on an alleged inadeqaute record in which case it should have ordered an evidentiary hearing to conduct a proper review of the facts and the evidence presented by Petitioner.

Dated: 4-17-, 2007

Respectfully submitted,

V. Mosby

Vincent Mosby, petitioner

# EXHIBIT  "A"

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

COURT OF APPEAL - SECOND DIST.
FILED
APR 11 2007
JOSEPH A. LANE Clerk
J. BELCHER Deputy Clerk

| In re VINCENT MOSBY on Habeas Corpus. | B197463<br>(Super. Ct. No. BH003842)<br>(Steven Van Sicklen, Judge)<br>**ORDER** |
|---|---|

THE COURT:

The court has read and considered the petition for writ of habeas corpus, filed March 16, 2007. The petition is denied. Petitioner fails to submit an adequate record for review, omitting the complete transcript of proceedings before the Board of Parole Hearings. (*People v. Duvall* (1995) 9 Cal.4th 464, 474.) Based on the record that his provided, the petition is also denied because there appears to be some evidence in support of the decision. (*In re Dannenberg* (2005) 34 Cal.4th 1061, 1071, 1080; *In re Rosenkrantz* (2002) 29 Cal.4th 616, 664-665.) Petitioner's objections to the Board of Parole Hearings itself fail to demonstrate any specific bias, and his claim of a no-parole policy is undermined by evidence submitted that parole dates have, in fact, been granted to numerous prisoners. Petitioner further fails to show any violation of his equal protection or due process rights. (*In re Dannenberg* at pp. 1083, 1097-1098.) To the extent petitioner is asserting a claim of ineffective assistance of counsel, petitioner fails to show that counsel's performance fell below a reasonable standard or that, but for counsel's

alleged ineffectiveness, the outcome of his hearing would have been different. (*Strickland* v. *Washington* (1984) 466 U.S. 668, 693-694; *People* v. *Fosselman* (1983) 33 Cal.3d 572, 584.)

ARMSTRONG, Acting P.J. MOSK, J. KRIEGLER, J.

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

DEPT 100

| Date: | FEBRUARY 14, 2007 | | | |
|---|---|---|---|---|
| Honorable: | STEVEN R. VAN SICKLEN | Judge | J. PULIDO | Deputy Clerk |
| | NONE | Bailiff | NONE | Reporter |

(Parties and Counsel checked if present)

BH003842
In re,
VINCENT MOSBY,
Petitioner,
On Habeas Corpus

Counsel for Respondent:

Nature of Proceedings: ORDER RE: WRIT OF HABEAS CORPUS

The Court has read and considered petitioner's Writ of Habeas Corpus filed on May 2, 2006. Having independently reviewed the record, giving deference to the broad discretion of the Board of Parole Hearings ("Board") in parole matters, the Court concludes that the record contains "some evidence" to support the Board's finding that petitioner is unsuitable for parole. (See Cal. Code Regs., tit. 15, §2402; *In re Rosenkrantz* (2002) 29 Cal.4th 616, 667 (hereafter *Rosenkrantz*).)

On April 2, 1992, petitioner was received into custody after being convicted of second degree murder with the use of a firearm. Petitioner received a sentence of 16 years to life with a minimum parole eligible date of June 2, 2002. The record reflects that on May 23, 1990, petitioner and a crime partner entered into an argument with the victim, who was riding a bicycle in front of an apartment building where petitioner and his crime partner went to sell cocaine. The victim had banged a golf club against the apartment building's fence and called petitioner and his crime partner a racial slur. After the victim rode off, petitioner and his crime partner went in search of the victim but could not find him. Moments later, the victim returned to the apartment building and petitioner's crime partner and the victim began to argue again. When the victim rode away, petitioner's crime partner said "we're going to get him." Petitioner and his crime partner drove in petitioner's car in search of the victim. Petitioner's crime partner fired three shots at the victim with one bullet hitting the victim in the abdomen, killing him. Petitioner alleges that he thought that he and his crime partner were only going to find the victim to be involved in a fight and denies any intent to kill the victim.
The record reflects that the Board found petitioner unsuitable for parole after a parole consideration hearing held on December 8, 2005. Petitioner was denied parole for three years. The Board concluded that petitioner was unsuitable for parole and would pose an unreasonable risk of danger to society and a threat to public safety if released from prison. The Board based its decision on several factors, including his commitment offense.

The Court finds that that there is some evidence to support the Board's findings that the motive for the crime was very trivial in relation to the offense. (See Cal. Code Regs., tit. 15, § 2402, subd. (c)(1)(E).) The record further reflects that the Board also relied on several additional factors in denying petitioner parole at this time, and there is some evidence to support that decision. There is some evidence that petitioner is unsuitable because of petitioner's lack of insight indicating that he does not understand the nature and magnitude of his crime. (See Cal. Code Regs., tit. 15, § 2402, subd. (d)(3).) The Board cited to petitioner's minimization of his culpability and participation in the crime and his evasiveness in answering their questions during the hearing in support of its finding that petitioner lacked insight. The Court finds some evidence that petitioner is unsuitable

Minutes Entered
02-14-07
County Clerk

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

DEPT 100

| Date: | FEBRUARY 14, 2007 | | | |
|---|---|---|---|---|
| Honorable: | STEVEN R. VAN SICKLEN | Judge | J. PULIDO | Deputy Clerk |
| | NONE | Bailiff | NONE | Reporter |

(Parties and Counsel checked if present)

BH003842
In re,
VINCENT MOSBY,
Petitioner,
On Habeas Corpus

Counsel for Respondent:

based on petitioner's limited programming, insufficient self-help and failure to complete a vocational and upgrade educationally – activities that would indicate an enhanced ability to function within the law upon release. (See Cal. Code Regs., tit. 15, § 2402, subd. (d)(9).) In addition, the Board found petitioner's most recent psychological report to be inconclusive regarding petitioner's risk of dangerousness because the evaluation was incomplete due to the fact that the petitioner terminated his psychological evaluation interview early.

The Board was acting within its authority when it considered petitioner's various preconviction and postconviction factors, yet concluded that he would pose an unreasonable threat to public safety. (See Pen. Code § 3041, subd. (b).)

Therefore, the petition is denied.

The court order is signed and filed this date. The clerk is directed to give notice.

A true copy of this minute order is sent to the petitioner via U.S. Mail as follows:

Vincent Mosby
H-29851
Correctional Training Facility
P.O. Box 689
Soledad, CA 93960-0689

Minutes Entered
02-14-07
County Clerk

| SUPERIOR COURT OF CALIFORNIA<br>COUNTY OF LOS ANGELES | Reserved for Clerk's File Stamp<br>CONFORMED COPY<br>OF ORIGINAL FILED<br>Los Angeles Superior Court<br>FEB 16 2007<br>John A. Clarke, Executive Officer/Clerk<br>By ____________, Deputy |
|---|---|
| COURTHOUSE ADDRESS:<br>Clara Shortridge Foltz Criminal Justice Center<br>210 West Temple Street<br>Los Angeles, CA 90012 | |
| PLAINTIFF/PETITIONER:<br>VINCENT MOSBY | |
| **CLERK'S CERTIFICATE OF MAILING**<br>CCP, § 1013(a)<br>Cal. Rules of Court, rule 2(a)(1) | CASE NUMBER:<br>BH003842 |

I, the below-named Executive Officer/Clerk of the above-entitled court, do hereby certify that I am not a party to the cause herein, and that this date I served:

- ☐ Order Extending Time
- ☐ Order to Show Cause
- ☐ Order for Informal Response
- ☐ Order for Supplemental Pleading
- ☑ Order re: Writ of Habeas Corpus
- ☐ Order
- ☐ Order re:
- ☐ Copy of

I certify that the following is true and correct: I am the clerk of the above-named court and not a party to the cause. I served this document by placing true copies in envelopes addressed as shown below and then by sealing and placing them for collection; stamping or metering with first-class, prepaid postage; and mailing on the date stated below, in the United States mail at Los Angeles County, California, following standard court practices.

February 16, 2007
DATED AND DEPOSITED

JOHN A. CLARKE, Executive Officer/Clerk

By: ____________, Clerk
Joseph M. Pulido

Vincent Mosby
H-29851
Correctional Training Facility
P.O. Box 689
Soledad, CA 93960-0689

# EXHIBIT   "B"

HISTORY

1. Repealer of former Section 2373 and renumbering of Section 2374 to Section 2373 filed 6-11-79; effective thirtieth day thereafter (Register 79, No. 24). For history of former section, see Register 77, No. 44.

## Article 11. Parole Consideration Criteria and Guidelines for Murders Committed on or After November 8, 1978, and Specified Attempted Murders

### § 2400. Scope of Article.

The criteria and guidelines in this article apply to prisoners sentenced to prison for first and second degree murders committed on or after November 8, 1978 and attempted murders where the perpetrator is sentenced for life pursuant to the provisions of Penal Code section 664. The guidelines in this article are based on the public's expressed intent in amending Penal Code sections 190 and 664 that a person convicted of first or second degree murder or attempted murder, as specified, should be incarcerated for an extended period of time.

The prisoner's minimum eligible parole date is established by statute. The amount of good conduct credit that a prisoner sentenced for first or second degree murder may earn to reduce the minimum eligible parole date is established by statute. (Penal Code sections 2930 et seq.) Life prisoners convicted of attempted murder do not earn these credits. The department will determine the minimum eligible parole date. The length of time a prisoner must serve prior to actual release on parole is determined by the board. The amount of postconviction credit a prisoner may earn to reduce the length of time prior to release on parole is determined by the board. This article implements Penal Code section 3041 and concerns only the board's exercise of discretion in determining whether a prisoner is suitable for parole and, if so, when the prisoner should be released on parole.

The standards for the department's action in reducing the minimum eligible parole date and the standards for the board's decision whether to reduce the period of confinement are different. The department's decisions pursuant to Penal Code sections 2930 et seq. do not affect the Board's decision concerning postconviction credit pursuant to these rules.

A prisoner committed for first or second degree murder or attempted murder shall have his or her initial parole consideration hearing as provided in § 2268. The prisoner will have documentation hearings as provided in § 2269.1, but no specific amount of postconviction credit will be granted until the board has established a period of confinement.

Although many of the sections in this article are the same as the sections in Article 5, they are repeated in this article to avoid confusion between the rules applicable to prisoners who committed murders on or before November 7, 1978 and these rules which apply to prisoners who committed murders on or after November 8, 1978, and those who committed specified attempted murders. The suitability criteria are the same for both groups. The guidelines for establishing the periods of confinement are different because of the change in the minimum term for first degree murder and the change from a determinate to an indeterminate term for second degree murder and attempted murder. The provisions for adjusting the terms for other offenses are also different because of the change in Penal Code section 669 which permits courts to impose sentences consecutive to life terms (Stats. 1978, Ch. 579, eff. 1/1/79).

NOTE: Authority cited: Section 5076.2, Penal Code. Reference: Sections 182, 190, 664, 2930 et seq., 3040, 3041, 3046 and 5076.1, Penal Code.

HISTORY

1. New Article 11 (Sections 2400-2411) filed 9-8-81; effective thirtieth day thereafter (Register 81, No. 37).
2. Amendment filed 6-14-84; effective thirtieth day thereafter (Register 84, No. 24).
3. Amendment filed 11-13-85; effective thirtieth day thereafter (Register 85, No. 46).
4. Amendment filed 1-20-88; operative 2-19-88 (Register 88, No. 5).
5. Change without regulatory effect amending article heading and deleting the words "first degree" where they characterized the criminal offense of attempted murder in order to conform the regulation with the decision of the Supreme Court in *People v. Bright* (1996) 12 Cal.4th 652, 49 Cal.Rptr.2d 732, in which the court determined that the crime of attempted murder is not divided into degrees, filed 2-16-2001 pursuant to section 100, title 1, California Code of Regulations (Register 2001, No. 7).
6. Amendment of article heading, section and NOTE filed 5-13-2004 as an emergency; operative 5-17-2004 (Register 2004, No. 20). A Certificate of Compliance must be transmitted to OAL by 9-14-2004 or emergency language will be repealed by operation of law on the following day.
7. Amendment of article heading, section and NOTE refiled 9-13-2004 as an emergency; operative 9-13-2004 (Register 2004, No. 38). A Certificate of Compliance must be transmitted to OAL by 1-11-2005 or emergency language will be repealed by operation of law on the following day.

### § 2401. General.

A life prisoner shall be considered for parole for the first time at the initial parole consideration hearing scheduled as provided in Section 2268. A parole date shall be denied if the prisoner is found unsuitable for parole under Section 2402(c). A parole date shall be set if the prisoner is found suitable for parole under Section 2402(d). A parole date set under this article shall be set in a manner that provides uniform terms for offenses of similar gravity and magnitude with respect to the threat to the public.

In setting the parole date the panel shall consider the Sentencing Rules for the Superior Courts. The panel shall also consider the criteria and guidelines set forth in this article for determining the suitability for parole and the setting of parole dates, considering the number of victims of the crime for which the prisoner was sentenced and any other circumstances in mitigation or aggravation.

The terms in this article are guidelines only. The suggested terms serve as the starting point for the board's consideration of each case on an individual basis. The board may establish a term above or below the guidelines when warranted and reasons are stated on the record. A prisoner shall not be released before the minimum eligible parole date.

NOTE: Authority cited: Section 5076.2, Penal Code. Reference: Sections [illegible] and 3041, Penal Code.

HISTORY

1. Amendment filed 8-12-82; effective thirtieth day thereafter (Register 82, No. 33).
2. Amendment filed 11-13-85; effective thirtieth day thereafter (Register 85, No. 46).

### § 2402. Determination of Suitability.

(a) General. The panel shall first determine whether the life prisoner is suitable for release on parole. Regardless of the length of time served, a life prisoner shall be found unsuitable for and denied parole if in the judgment of the panel the prisoner will pose an unreasonable risk of danger to society if released from prison.

(b) Information Considered. All relevant, reliable information available to the panel shall be considered in determining suitability for parole. Such information shall include the circumstances of the prisoner's social history; past and present mental state; past criminal history, including involvement in other criminal misconduct which is reliably documented; the base and other commitment offenses, including behavior before, during and after the crime; past and present attitude toward the crime; any conditions of treatment or control, including the use of special conditions under which the prisoner may safely be released to the community; and any other information which bears on the prisoner's suitability for release. Circumstances which taken alone may not firmly establish unsuitability for parole may contribute to a pattern which results in a finding of unsuitability.

(c) Circumstances Tending to Show Unsuitability. The following circumstances each tend to indicate unsuitability for release. These circumstances are set forth as general guidelines; the importance attached to any circumstance or combination of circumstances in a particular case is left to the judgment of the panel. Circumstances tending to indicate unsuitability include:

(1) Commitment Offense. The prisoner committed the offense in an especially heinous, atrocious or cruel manner. The factors to be considered include:

(A) Multiple victims were attacked, injured or killed in the same or separate incidents.

(B) The offense was carried out in a dispassionate and calculated manner, such as an execution-style murder.

(C) The victim was abused, defiled or mutilated during or after the offense.

(D) The offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering.

(E) The motive for the crime is inexplicable or very trivial in relation to the offense.

(2) Previous Record of Violence. The prisoner on previous occasions inflicted or attempted to inflict serious injury on a victim, particularly if the prisoner demonstrated serious assaultive behavior at an early age.

(3) Unstable Social History. The prisoner has a history of unstable or tumultuous relationships with others.

(4) Sadistic Sexual Offenses. The prisoner has previously sexually assaulted another in a manner calculated to inflict unusual pain or fear upon the victim.

(5) Psychological Factors. The prisoner has a lengthy history of severe mental problems related to the offense.

(6) Institutional Behavior. The prisoner has engaged in serious misconduct in prison or jail.

(d) Circumstances Tending to Show Suitability. The following circumstances each tend to show that the prisoner is suitable for release. The circumstances are set forth as general guidelines; the importance attached to any circumstance or combination of circumstances in a particular case is left to the judgment of the panel. Circumstances tending to indicate suitability include:

(1) No Juvenile Record. The prisoner does not have a record of assaulting others as a juvenile or committing crimes with a potential of personal harm to victims.

(2) Stable Social History. The prisoner has experienced reasonably stable relationships with others.

(3) Signs of Remorse. The prisoner performed acts which tend to indicate the presence of remorse, such as attempting to repair the damage, seeking help for or relieving suffering of the victim, or indicating that he understands the nature and magnitude of the offense.

(4) Motivation for Crime. The prisoner committed his crime as the result of significant stress in his life, especially if the stress has built over a long period of time.

(5) Battered Woman Syndrome. At the time of the commission of the crime, the prisoner suffered from Battered Woman Syndrome, as defined in section 2000(b), and it appears the criminal behavior was the result of that victimization.

(6) Lack of Criminal History. The prisoner lacks any significant history of violent crime.

(7) Age. The prisoner's present age reduces the probability of recidivism.

(8) Understanding and Plans for Future. The prisoner has made realistic plans for release or has developed marketable skills that can be put to use upon release.

(9) Institutional Behavior. Institutional activities indicate an enhanced ability to function within the law upon release.

NOTE: Authority cited: Sections 3041 and 5076.2, Penal Code. Reference: Sections 3041 and 4801, Penal Code.

HISTORY

1. New subsection (d)(5), subsection renumbering, and amendment of NOTE filed 3-16-2001 as an emergency; operative 3-16-2001 (Register 2001, No. 11). A Certificate of Compliance must be transmitted to OAL by 7-16-2001 or emergency language will be repealed by operation of law on the following day.
2. Certificate of Compliance as to 3-16-2001 order transmitted to OAL 7-16-2001 and filed 8-20-2001 (Register 2001, No. 34).

## § 2403. Base Term.

(a) General. The panel shall set a base term for each life prisoner who is found suitable for parole. The base term shall be established solely on the gravity of the base crime, taking into account all of the circumstances of that crime. If the prisoner has been received in prison for more than one murder committed on or after November 8, 1978, the base crime is the most serious of the murders considering the facts and circumstances of the crime. If the prisoner has been sentenced to prison for murders committed before November 8, 1978 and for murders committed on or after November 8, 1978, the base offense shall be the most serious of the murders committed on or after November 8, 1978.

The base term shall be established by utilizing the appropriate matrix of base terms provided in this section. The panel shall determine the category most closely related to the circumstances of the crime. The panel shall impose the middle base term reflected in the matrix unless the panel finds circumstances in aggravation or mitigation.

If the panel finds circumstances in aggravation or in mitigation as provided in §§ 2404 or 2405, the panel may impose the upper or lower base term provided in the matrix by stating the specific reason for imposing such a term. A base term other than the upper, middle or lower base term provided in the matrix may be imposed by the panel if justified by the particular facts of the individual case and if the facts supporting the term imposed are stated.

(b) Matrix of Base Terms for First Degree Murder committed on or after November 8, 1978.

| | CIRCUMSTANCES | | | |
|---|---|---|---|---|
| *First Degree Murder* | A. *Indirect* | B *Direct or Victim Contribution* | C. *Severe Trauma* | D. *Torture* |
| Penal Code § 189 (in years and does not include post conviction credit as provided in § 2410) | Victim died of causes related to the act of the prisoner but was not directly assaulted by prisoner with deadly force; e.g., shock producing heart attack, a crime partner actually did the killing. | Death was almost immediate or resulted at least partially from contributing factors from the victim; e.g., victim initiated struggle or had goaded the prisoner. This does not include victim acting in defense of self or property. | Death resulted from severe trauma inflicted with deadly intensity; e.g., beating, clubbing, stabbing, strangulation, suffocation, burning, multiple wounds inflicted with a weapon not resulting in immediate death or actions calculated to induce terror in the victim. | Victim was subjected to the prolonged infliction of physical pain through the use of nondeadly force prior to act resulting in death. |
| I. *Participating Victim* Victim was accomplice or otherwise implicated in a criminal act with the prisoner during which or as a result of which the death occurred, e.g., crime partner, drug dealer, etc. | 25-26-27 | 26-27-28 | 27-28-29 | 28-29-30 |

# EXHIBIT "C"

and he "almost certainly relied upon that likelihood" in pleading guilty, the Court held that § 212(c) relief remained available for him. *Id.* at 325, 326.

Unlike St. Cyr, Gonzalez did not have "settled expectations" of relief when he pled guilty in 1994. *Id.* at 321 (internal quotations omitted). The statutory bar to § 212(c) relief, which was triggered by sentences for a term of five years or more, has no such counterpart in § 212(h). Thus, unlike in *St. Cyr,* there is no indication that, as a matter of common practice, aliens have chosen to forego their constitutional right to trial in reliance on maintaining their eligibility for § 212(h) relief by pleading guilty and thus ensuring a particular sentence.

Gonzalez contends that, at the time he pled guilty, he could have applied for adjustment of status to LPR status, pursuant to 8 U.S.C. § 1255(i). Although he was ineligible for adjustment of status because his conviction rendered him inadmissible, he further could have sought a waiver of inadmissibility under § 212(h). There is no evidence in the record, however, that Gonzalez ever applied to adjust his status, that his parents applied for a visa, or that a visa would have been immediately available if an application had been filed on his behalf, as required by 8 U.S.C. § 1255(i)(2)(B). Thus, unlike St. Cyr, whose eligibility for relief was based solely on the exercise of the Attorney General's discretion under § 212(c), the possibility of relief for Gonzalez was remote. In these circumstances, we cannot conclude that he had settled expectations of relief when he pled guilty to the aggravated felony, within the meaning of *St. Cyr.*

We note our holding in *Alvarez-Barajas v. Gonzales,* 418 F.3d 1050 (9th Cir. 2005), that § 348(b) of IIRIRA, the provision that made aliens convicted of aggravated felonies ineligible for § 212(h) discretionary relief, could be applied retroactively to aliens who pled guilty to such felonies prior to the April 1, 1997, effective date of IIRIRA § 348. *Id.* at 1054-55. *Alvare-zBarajas*, however, is not dispositive of the instant case because § 348 expressly applies only to LPRs. *See* IIRIRA § 348(a) (amending § 212(h) by prohibiting the grant of a waiver "in the case of an alien who has previously been admitted to the United States as an alien lawfully admitted for permanent residence"). This limitation on § 212(h) relief, therefore, does not apply to Gonzalez, who is not and has never been an LPR. *See United States v. Arrieta*, 224 F.3d 1076, 1080 n.2 (9th Cir. 2000) (noting that the § 212(h) limitation on an alien convicted of an aggravated felony did not apply to someone who never was a lawful permanent resident). Our holding thus rests on Gonzalez's failure to establish that § 1228 disrupted his settled expectations.

Gonzalez was ineligible for § 212(h) relief when he was served with a Notice to Appear on December 8, 1997, because of the 1996 amendments to § 1228(b)(5). Therefore, Gonzalez's argument that his waiver was invalid because he was not informed of his eligibility for relief necessarily fails. *Cf. Ubaldo-Figueroa*, 364 F.3d at 1051 (holding that the IJ's failure to inform alien that he was eligible for relief from deportation constitutes a due process violation if alien establishes prejudice). We therefore conclude that Gonzalez's waiver of his right to appeal was valid.

## III. CONCLUSION

Because Gonzalez validly waived the right to appeal the deportation orders underlying his indictment for violation of § 1326, Gonzalez cannot collaterally attack the validity of those underlying deportations. *See MuroInclan*, 249 F.3d at 1182 (explaining that an alien is barred from collaterally attacking the validity of an underlying deportation order "if he validly waived the right to appeal that order" during the deportation proceedings). Accordingly, the judgment of the district court is

AFFIRMED.

1 Most of the functions of the INS have since been transferred to the newly-created Department of Homeland Security. *See* Homeland Security Act of 2002, Pub. L. No. 107-296, §§ 441, 471, 116 Stat. 2135, 2192, 2205 (2002). For convenience, we refer to the agency involved as the INS.

2 There is no question that § 1228 does not contain express language directing retroactive application. We therefore proceed to the second step of the analysis.

## ORDER

Cite as 2005 DJDAR 13803

SCOTT (GEORGE) ON H.C.

No. S138430
C.A. 1st, Div. 2, No. A108894
California Supreme Court
Filed November 30, 2005

Petition for review and application for stay denied.

The request for an order directing depublication of the opinion is denied. Baxter, J., is of the opinion the petition should be granted.

## ORDER

Cite as 2005 DJDAR 13803

IN RE V. (X)

No. S138370
C.A. 4th, Div. 1, Nos. D045843 D046350
California Supreme Court
Filed November 30, 2005

Petition for review & depublication request denied.



# EXHIBIT

"D"

## ORDER

Cite as 2005 DJDAR 5863

CARL MERTON IRONS, II,
Petitioner-Appellee,
v.
TOM L. CAREY, Warden,
Respondent-Appellant.

No. 05-15275
D.C. No. CV-04-00220-LKK
United States Court of Appeals
Ninth Circuit
Filed May 18, 2005

Eastern District of California,
Sacramento

Before: REINHARDT, NOONAN, and FERNANDEZ, Circuit Judges.

The parties are ordered to file supplemental briefs, not to exceed 25 pages, within 28 days from the date of this order. The supplemental briefs shall discuss the constitutionality of the standards that Congress has set forth in the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254(d)(1). Specifically, the parties should discuss, in light of *Marbury v. Madison*, 5 U.S. (1 Cranch) 137 (1803), and *City of Boerne v. Flores*, 521 U.S. 507, 536 (1997), whether AEDPA unconstitutionally prescribes the sources of law that the Judicial Branch must use in exercising its jurisdiction or unconstitutionally prescribes the substantive rules of decision by which the federal courts must decide constitutional questions that arise in state habeas cases. The parties should consider whether, under the separation of powers doctrine or for any other reason involving the constitutionality of 28 U.S.C. § 2254(d)(1), this court should decline to apply the AEDPA standards in this case.

This court also certifies the above question to the Attorney General of the United States pursuant to 28 U.S.C. § 2403(a). The Attorney General is permitted to intervene and file a brief, not to exceed 25 pages, within 28 days from the date of this order. If the panel determines that further oral argument would be of assistance, it will schedule such argument and inform the parties, the Attorney General, and any amici at that time. This court also invites interested parties to request leave, within 14 days from the day of this order, to file amicus curiae briefs. Should leave be granted, such parties shall have 21 days from the date thereof to file briefs of not more than 20 pages. Judge Fernandez does not join in this order.

## MODIFICATION
## CRIMINAL LAW AND PROCEDURE

*Search of probationer was valid even though guilty plea resulting in probation was later vacated.*

Cite as 2005 DJDAR 5863

THE PEOPLE,
Plaintiff and Respondent,
v.
CHRISTOPHER JOSEPH MILLER,
Defendant and Appellant.

No. G031747
(Super. Ct. Nos. 99SF0643, 02CF2547)
California Court of Appeal
Fourth Appellate District
Division Three
Filed December 6, 2004

ORDER MODIFYING OPINION;
NO CHANGE IN JUDGMENT

The opinion filed in this case on October 26, 2004, and ordered published on November 19, 2004, is hereby modified as follows:

On page 5, in the second sentence of the first full paragraph, the quotation should have internal quotation marks as well as initial quotation marks. Also, the third sentence-- a parenthetical citation—of that same paragraph should be replaced with the following: "(*People v. Leyba* (1981) 29 Cal.3d 591, 597.)"

This modification does not effect a change in the judgment.

SILLS, P. J.

We concur:
RYLAARSDAM, J.
MOORE, J.

## ORDER

*Certiorari Summary -- Disposition*

Cite as 2005 DJDAR 5863

AYOTTE, ATT'Y GEN. OF NH
v.
PLANNED PARENTHOOD

No. 04-1144
United States Supreme Court
Filed May 23, 2005

The petition for a writ of certiorari is granted.

## ORDER

*Certiorari Summary -- Disposition*

Cite as 2005 DJDAR 5863

TIEN F. HSU, ET AL.
v.
CLARK COUNTY NV

No. 04-1282
United States Supreme Court
Filed May 23, 2005

The motion of Pacific Legal Foundation for leave to file a brief as *amicus curiae* is granted. The petition for a writ of certiorari is denied.



**PROOF OF SERVICE BY MAIL**
**BY PERSON IN STATE CUSTODY**
(C.C.P. §§ 1013(A), 2015,5)

I, Vincent Mosby, declare:

I am over 18 years of age and I am party to this action. I am a resident of CORRECTIONAL TRAINING FACILITY prison, in the County of Monterrey, State of California. My prison address is:

Vincent Mosby, CDCR #: H25851
CORRECTIONAL TRAINING FACILITY
P.O. BOX 689, CELL #: F-241
SOLEDAD, CA 93960-0689.

On April 17 2007, I served the attached:

Petition for Review and Application for Relief from Default

on the parties herein by placing true and correct copies thereof, enclosed in a sealed envelope (verified by prison staff), with postage thereon fully paid, in the United States Mail in a deposit box so provided at the above-named institution in which I am presently confined. The envelope was addressed as follows:

Office of the Attorney General
300 South Spring Street
Los Angeles, CA 90013

Court of Appeal
Second Appellate District
300 South Spring Street
Second Floor - North Tower
Los Angeles, CA 90013-1204

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on April 17 2007

V. Mosby
Declarant

SUBSEQUENT PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PAROLE HEARINGS

In the matter of the Life Term Parole Consideration Hearing of: )

VINCENT MOSBY )

CDC Number H-29851

INMATE COPY

CORRECTIONAL TRAINING FACILITY

SOLEDAD, CALIFORNIA

DECEMBER 8, 2005

8:30 A.M.

PANEL PRESENT:

Ms. Susan Fisher, Presiding Commissioner
Ms. Danielle Lopez, Deputy Commissioner

OTHERS PRESENT:
Mr. Vincent Mosby, Inmate
Ms. Pat Fox, Attorney for Inmate
Mr. Christopher Frisco, Deputy District Attorney
Correctional Officers Unidentified

CORRECTIONS TO THE DECISION HAVE BEEN MADE

__________ No See Review of Hearing
__________ Yes Transcript Memorandum

C. M. LOPEZ, Peters Shorthand Reporting

**CALIFORNIA BOARD OF PAROLE HEARINGS**

**D E C I S I O N**

**DEPUTY COMMISSIONER LOPEZ:** We're on record.

**PRESIDING COMMISSIONER FISHER:** I will note for the record that everyone who was previously in the room and identified themselves have returned to the room. And, Mr. Mosby, the panel reviewed all the information received from the public and relied on the following circumstances in concluding that you are not yet suitable for parole and would pose an unreasonable risk of danger to society or a threat to public safety if released from prison. Certainly the first thing that we did consider was the commitment offense. And Mr. Mosby didn't talk about the commitment offense today, as is his right. And I note that he was not in any way penalized for that. However, the information that we did have to rely on was from a prior transcript and also his statement in the Board Report. This was a situation where Mr. Perez apparently kind of happened to be in the wrong place at the wrong time. Mr. Mosby in his statements to the prior panel and also in his statement in the Board Report indicated that

essentially he thought that he and Mr. Monty were going to find Mr. Perez in order to be involved in a fight. He says that it was his own action that caused this death and that if he knew the person that he was with that night had the potential to shoot and kill someone, he wouldn't have allowed himself to be in their company. The appellate (indiscernible), however, states that -- and I'm reading verbatim now -- the gun that killed the victim was a .45 caliber. Earlier that evening, the defendant had been seen with a military-style .45 caliber handgun. Also that evening, the gun had been seen under the seat of the defendant's car. Three .45 caliber casings from an automatic handgun were found at the scene. The bullet found in the victim was a .45 caliber full-jacket and was a military-bought ammunition spent projectile. He also stated that he may have seen -- it says specifically he admitted that he had -- he also admitted he had seen (indiscernible) .45 caliber handgun on prior occasions, however, explicitly denied (indiscernible) what he intended to do with the gun. That in spite of the fact that one witness made a statement that one of the men -- and it

was one of the other men, that it was there -- actually, that's not correct. I'm sorry. That was in one of the other reports. According to the appellate report, the appellate facts, it states on the way to the bookstore, Harris overheard either Mosby or Monty say let's cap a Mexican -- let's go cap a Mexican. Coincidentally, Mr. Perez happened to be of Hispanic descent. There is every indication, in (indiscernible) this panel, that Mr. Mosby is (indiscernible) minimizing his participation in this crime. This was an offense that was certainly callous. Mr. Perez may have gotten into a verbal altercation with Mr. Monty as was stated by Mr. Mosby, but he certainly didn't do anything that rose to the level of causing them to feel that they needed to hunt him down and shoot him. And that's exactly what happened. The motive for this crime is incredibly trivial in relation to this offense in the death of this man. The prisoner does not have what I would characterize as an escalating pattern of criminal conduct. He has some prior criminal behavior; but based on information that we have in the file, it seems to be somewhat minimal. He -- a petition was sustained on a battery as a

juvenile. He was sent home on probation. He was found guilty of possession of a dangerous weapon, a misdemeanor; and that was nunchakus that he explained were found in his possession; and something was going on where the police came to apparently an apartment or a home they shared with roommates. And he was found guilty of a misdemeanor, false ID to a peace officer. He does have an unstable social history, and that would include his substance abuse, which has been reported as (indiscernible) in the last two hearings as experimentation with different kinds of substances but not as an addictive problem. There's information in the Probation Officer's Report that's different, and Mr. Mosby explained to us today that he exaggerated his drug use at the time because -- out of fear of going to CDC. Certainly, not the first time we've seen that. He also dropped out of school after he completed the 11th grade, and he was selling drugs. That certainly, as far as this panel is concerned, indicates an unstable social history. He has programmed in a limited manner while he's been incarcerated. He has failed to upgrade educationally or vocationally as it was instructed by the prior panel, and he has not

sufficiently participated in beneficial self-help at this time. He has had two 128a's counseling chronos; the last one was back in 1999; and he has had absolutely no 115 disciplinaries while he's been incarcerated for this crime. The psychiatric evaluation was written on January 14th, '02, and was authored by Dr. Fishback. There are various (indiscernible) where the panel disagrees with Dr. Fishback, and I'm going to state them specifically for the record. One of them is that Dr. Fishback believes that -- or indicated that -- Mr. Mosby had developed (indiscernible) insight into the crime and himself. It is our feeling that Mr. Mosby's characterization of his participation to the doctor by indicating that in his instant offense he appeared to be at fault for not doing anything to stop the murder from happening; and it says, quote -- or in parentheses -- in the inmate's own words, rather than any violent act of his own making. It is the panel's belief that this indicates a lack of insight into his culpability and participation in this crime. I will read a couple of other things for the record relating to -- relating to the area where the doctor was to examine

feasibility in his plans, destabilizers, lack of personal (indiscernible) stress, it says these areas were not able to be examined because the inmate terminated the interview early. Consequently, the opinion regarding risk of dangerousness based upon all the above criteria must remain incomplete by this evaluator at the time. It does note that he believes that Mr. Mosby has grown ethically, socially, and vocationally to a much more advanced level than most other inmates; and I would have to disagree with that also. Mr. Mosby has certainly not gained insight into his own behaviors, not just this offense but also other behavior institutionally and specifically the protracted conversation we had today trying to get from him whether or not he actually called an officer an inappropriate name; and his contention of the fact that he did it was less important than whether he said it to her face or whether she could possibly have seen him say it indicates to this panel that an attitude of if somebody didn't see it and I can get away with it, then they don't know whether I did it or not. So that, personally, I don't find that that's any kind of growth. And he hasn't completed a

vocation, so he has not grown vocationally to a much more advanced level than most other inmates, many of who come in here with numerous vocations. I also want to state for the record that I think that Mr. Fishback's characterization of Mr. Mosby's work record is somewhat misleading in that he talks about his work record, receiving satisfactory to above-average ratings; and for the most part in recent history, those have been simply satisfactory; and that's not a good -- that's not a bad thing -- it's simply a fact. Those are the areas that this panel had concerns about (indiscernible) evaluation. Prisoner does have good (indiscernible). He clearly has good family support. He has an offer of a job at a family-owned school. Neither of us know whether a convicted felon can work at a school; but I certainly think that under normal circumstances, where it wasn't a family-owned, that there would be a background check and that that would be of some concern.

**ATTORNEY FOX:** My understanding as far as that goes, there may not be a legal preclusion of that; but the insurance company may decline coverage.

**PRESIDING COMMISSIONER FISHER:** I think the parents might have some issues with it too.

**ATTORNEY FOX:** So I don't know.

**PRESIDING COMMISSIONER FISHER:** Okay. The panel does note that in response to 3042 Notices, the Los Angeles Police Department (indiscernible) indicate an opposition to finding suitability at this time; and that was based -- I (indiscernible) to say that the objection was based entirely on the commitment offense (indiscernible) post-conviction factors. The panel finds that Mr. Mosby needs to continue to participate in self-help in order to face, discuss, and understand his own behaviors, the factors that led to this commitment offense, and to gain insight and learn to take responsibility for his own behavior in a very forthright manner. We want to commend him for being 115 free during his entire incarceration, for his participation in Anger Management, for completing the Impact course shortly after his last hearing, and for his participation in Narcotics Anonymous. Apparently, however, the positive aspects of behavior do not outweigh the factors of unsuitability. In a separate decision, the hearing panel finds that the

prisoner has been convicted of murder, and it's not reasonable to expect that parole be granted at a hearing during the next three years. The specific reasons for this finding are as follows. First of all, the commitment offense. This was a situation where Mr. Perez happened to go by Mr. Mosby and Mr. Monty. Words were exchanged, and in response to that Mr. Mosby and Mr. Monty got in the car and went after him with a gun, and they shot him and killed him. Mr. Mosby continues to minimize his participation in this crime and characterizes it as making some bad decisions and being guilty because he didn't stop the murder. And there certainly is some evidence in the appellate decision as well as in other parts of the file that indicate that that's just simply what I called it, minimization. (indiscernible) the motive for this crime was just incredibly trivial. He does have an unstable social history; and as I indicated before, that includes using drugs, selling drugs, and dropping out of high school. He has some prior criminal behavior, but none of it is felony behavior. I continue to be, as I indicated during the hearing, troubled by the fact that I couldn't even get straightforward

answers about that today. I think we were pretty much having to arm wrestle answers out of Mr. Mosby about his prior bad behavior, including the 128a counseling chrono that we talked about here today. To this panel that indicates a clear lack of insight and to continue to participate in self-help. As I noted earlier, the psychological evaluation from January of '02, authored by Dr. Fishback, had some areas that this panel simply disagreed with; and -- and I also want to note that Dr. Fishback's conclusion was that Mr. Mosby's risk level was low compared to other citizens on the street but only if he doesn't associate with those of poor judgment or criminal intent, and that this panel would like to see it so that Mr. Mosby's risk level is low compared to other citizens on the street, period. He has not yet completed necessary programming that is essential to his adjustment and needs additional time to gain that programming. That would be to complete a vocation, to complete a GED, to spend a longer period of time in substance abuse programming, and to continue to participate in self-help in the areas of insight and impact. Mr. Mosby, I know that sometimes it's difficult

to get into programs in the institution, and so certainly anything that you do on your own is -- carries just as much weight as anything that you can get in the institution. You simply just bring the reports back to the next panel. And that concludes the review of the decision. Do you have any comments?

**DEPUTY COMMISSIONER LOPEZ:** I wish you luck, sir.

**PRESIDING COMMISSIONER FISHER:** Thank you. That completes the hearing.

--oOo--

APR 07 2006

**PAROLE DENIED THREE YEARS.**

**THIS DECISION WILL BE FINAL ON:**__________________.

**YOU WILL BE PROMPTLY NOTIFIED IF, PRIOR TO THAT DATE, THE DECISION IS MODIFIED.**

CERTIFICATE AND
DECLARATION OF TRANSCRIBER

I, C.M. LOPEZ, a duly designated transcriber, PETERS SHORTHAND REPORTING, do hereby declare and certify under penalty of perjury that I have transcribed tape(s) which total one in number and cover a total of pages numbered 1-78, and which recording was duly recorded at CORRECTIONAL TRAINING FACILITY, SOLEDAD, CALIFORNIA, in the matter of the SUBSEQUENT PAROLE CONSIDERATION HEARING OF VINCENT MOSBY, CDC NO. H-29851, ON DECEMBER 8, 2005, and that the foregoing pages constitute a true, complete, and accurate transcription of the aforementioned tape to the best of my ability.

I hereby certify that I am a disinterested party in the above-mentioned matter and have no interest in the outcome of the hearing.

Dated December 24, 2005, at Sacramento, California.

C.M. LOPEZ
TRANSCRIBER
**PETERS SHORTHAND REPORTING**



Vincent Mosby H29851
P.O. Box 689 F-307L
Soledad, CA 93960-0689

OFFICE Of THE CLERK,
U.S. DISTRICT COURT
NORTHERN DISTRICT of CALIFORNIA
1301 CLAY St, Suite 400S
OAKLAND, CA 94612-5212

LEGAL MAIL