United States District Court
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

VINCENT A. MOSBY,

              Petitioner,

  v.

ANTHONY P. KANE, Warden,

              Respondent.

_____/

No. C 07-04216  SBA (PR)

**ORDER DENYING PETITION FOR
WRIT OF HABEAS CORPUS; AND
GRANTING CERTIFICATE OF
APPEALABILITY**

**INTRODUCTION**

      This is a habeas corpus case filed by a state prisoner pursuant to 28 U.S.C. § 2254. Respondent was ordered to show cause why the writ should not be granted.  Respondent has filed an answer.  Petitioner has responded with a traverse.  For the reasons set forth below, the petition for a writ of habeas corpus is DENIED.

**PROCEDURAL BACKGROUND**

      On March 23, 1992, Petitioner was sentenced to a term of sixteen years to life.  (Mot. to Am., Ex. A at 2.)  On December 8, 2005, the California Board of Parole Hearings (Board) denied Petitioner parole.  (Answer, Ex. D.)

      Petitioner first sought habeas corpus relief in the state courts.  On May 2, 2006, Petitioner filed a habeas petition in the Los Angeles County Superior Court, which was denied on February 14, 2007.  (Answer, Ex. A.)  On March 16, 2007, Petitioner filed a habeas petition in the state appellate court, which was denied on April 11, 2007.  (Id.)  On April 19, 2007, Petitioner filed a petition for review in the state supreme court, which was denied on June 20, 2007.  (Id. at 12.)  In his petition for review, Petitioner raised three claims: (1) the Board's "refusal to set Petitioner's parole release date, based on the evidence presented, unlawfully deprived him of a constitutionally-protected state and federal liberty interest;" (2) "the 'some evidence' standard as applied by the [Board's] parole suitabilty decisions is an unreasonable application of prevailing U.S. Supreme Court Authority;" and (3) the Board "unduly deprived Petitioner of his equal protection rights when it denied petitioner parole based on the nature of the offense without consideration of his role therein, while giving other

**United States District Court**
For the Northern District of California

1  prisoners similarly situated the benefits of the law."  (Pet. for Rev. at 3, 12, 20.)

2      Petitioner filed his original federal petition on August 16, 2007, alleging eight separate

3  claims for relief.  (Pet. at 6-A - 6-D.)  On January 15, 2008, the Court ordered Respondent to show

4  cause why the original petition should not be granted.  On December 10, 2008, before Respondent

5  had filed his answer, Petitioner filed a motion requesting leave to file an amended petition.  In his

6  amended petition, he limited his claims for relief to the following two claims: (1) "The Board of

7  Parole Hearings violated Mr. Mosby's federal, constitutionally protected, liberty interest in parole

8  release by denying" him parole without "some evidence"; and (2) the state courts' opinions were

9  "contrary to, or an unreasonable application of the 'some evidence' standard and was also based on

10  an unreasonable determination of the facts."  (Am. Pet. at 6-A.)  The Court construes these claims

11  together as a claim for a violation of Petitioner's due process rights.

12      In an Order dated March 31, 2009, the Court granted Petitioner's motion requesting leave to

13  file an amended complaint and also issued a Second Order to Show Cause.  On March 9, 2010,

14  Respondent filed an answer.  On May 6, 2010, Petitioner filed a traverse.

15      In an Order dated May 24, 2010, the Court requested supplemental briefing from each party

16  explaining his views of how the <u>Hayward v. Marshall</u>, 603 F.3d 546 (9th Cir. 2010) en banc decision

17  applies to the facts presented in Petitioner's challenge.  (May 24, 2010 Order at 1.)  Respondent filed

18  his supplemental brief on June 10, 2010, and Petitioner filed his response on June 29, 2010.

19                              **STANDARD OF REVIEW**

20  **I.    AEDPA**

21      Under the Antiterrorism and Effective Death Penalty Act (AEDPA), a district court may

22  grant a petition challenging a state conviction or sentence on the basis of a claim that was

23  "adjudicated on the merits" in state court only if the state court's adjudication of the claim: "(1)

24  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly

25  established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in

26  a decision that was based on an unreasonable determination of the facts in light of the evidence

27  presented in the State court proceeding."  28 U.S.C. 2254(d).  A state court has "adjudicated" a

28  petitioner's constitutional claim "on the merits" for purposes of § 2254(d) when it has decided the

petitioner's right to post-conviction relief on the basis of the substance of the constitutional claim advanced, rather than denying the claim on the basis of a procedural or other rule precluding state court review on the merits.  Lambert v. Blodgett, 393 F.3d 943, 969 (9th Cir. 2004).  It is error for a federal court to review de novo a claim that was adjudicated on the merits in state court.  See Price v. Vincent, 538 U.S. 634, 638-43 (2003).

### A.    Section 2254(d)(1)

Challenges to purely legal questions resolved by a state court are reviewed under § 2254(d)(1), under which a state prisoner may obtain habeas relief with respect to a claim adjudicated on the merits in state court only if the state court adjudication resulted in a decision that was "contrary to" or "involved an unreasonable application of" "clearly established Federal law, as determined by the Supreme Court of the United States."  Williams v. Taylor, 529 U.S. 362, 402-04, 409 (2000).  While the "contrary to" and "unreasonable application" clauses have independent meaning, see id. at 404-05, they often overlap, which may necessitate examining a petitioner's allegations against both standards.  See Van Tran v. Lindsey, 212 F.3d 1143, 1149-50 (9th Cir. 2000), overruled on other grounds, Lockyer v. Andrade, 538 U.S. 63, 70-73 (2003).

### 1.    Clearly Established Federal Law

"Clearly established federal law, as determined by the Supreme Court of the United States" refers to "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision."  Williams, 529 U.S. at 412.  "Section 2254(d)(1) restricts the source of clearly established law to [the Supreme] Court's jurisprudence."  Id.  "A federal court may not overrule a state court for simply holding a view different from its own, when the precedent from [the Supreme] Court is, at best, ambiguous."  Mitchell v. Esparza, 540 U.S. 12, 17 (2003).  If there is no Supreme Court precedent that controls on the legal issue raised by a petitioner in state court, the state court's decision cannot be contrary to, or an unreasonable application of, clearly-established federal law.  See, e.g., Stevenson v. Lewis, 384 F.3d 1069, 1071 (9th Cir. 2004).

The fact that Supreme Court law sets forth a fact-intensive inquiry to determine whether constitutional rights were violated "obviates neither the clarity of the rule nor the extent to which the rule must be seen as 'established'" by the Supreme Court.  Williams, 529 U.S. at 391.  There are,

United States District Court
For the Northern District of California

however, areas in which the Supreme Court has not established a clear or consistent path for courts to follow in determining whether a particular event violates a constitutional right; in such an area, it may be that only the general principle can be regarded as "clearly established." Andrade, 538 U.S. at 64-65. When only the general principle is clearly established, it is the only law amenable to the "contrary to" or "unreasonable application of" framework. See id. at 73.

Circuit decisions may still be relevant as persuasive authority to determine whether a particular state court holding is an "unreasonable application" of Supreme Court precedent or to assess what law is "clearly established." Clark v. Murphy, 331 F.3d 1062, 1070-71 (9th Cir.), cert. denied, 540 U.S. 968 (2003); Duhaime v. Ducharme, 200 F.3d 597, 600 (9th Cir. 1999).

### 2.    "Contrary to"

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." Williams, 529 U.S. at 413. A "run-of-the-mill state-court decision" that correctly identifies the controlling Supreme Court framework and applies it to the facts of a prisoner's case "would not fit comfortably within § 2254(d)(1)'s 'contrary to' clause." Id. at 406. Such a case should be analyzed under the "unreasonable application" prong of § 2254(d). See Weighall v. Middle, 215 F.3d 1058, 1062 (9th Cir. 2000).

### 3.    "Unreasonable Application"

"Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Williams, 529 U.S. at 412-13.

"[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411; accord Middleton v. McNeil, 541 U.S. 433, 436 (2004) (per curiam) (challenge to state court's application of governing federal law must be not only erroneous, but objectively unreasonable); Woodford v. Visciotti, 537 U.S. 19, 25 (2002) (per curiam) ("unreasonable" application of law is not equivalent to

1  "incorrect" application of law).

2      Evaluating whether a rule application was unreasonable requires considering the relevant

3  rule's specificity; if a legal rule is specific, the range of reasonable judgment may be narrow; if it is

4  more general, the state courts have more leeway.  Yarborough v. Alvarado, 541 U.S. 652, 664

5  (2004).  Whether the state court's decision was unreasonable must be assessed in light of the record

6  that court had before it.  Holland v. Jackson, 542 U.S. 649, 651 (2004) (per curiam).

7      The objectively unreasonable standard is not a clear error standard.  Andrade, 538 U.S. at 75-

8  76 (rejecting Van Tran's use of "clear error" standard); Clark, 331 F.3d at 1067-69 (acknowledging

9  the overruling of Van Tran on this point).  After Andrade,

10     [T]he writ may not issue simply because, in our determination, a state court's
11     application of federal law was erroneous, clearly or otherwise.  While the
       "objectively unreasonable" standard is not self-explanatory, at a minimum it denotes
       a greater degree of deference to the state courts than [the Ninth Circuit] ha[s]
12     previously afforded them.

13  Id.  In examining whether the state court decision was unreasonable, the inquiry may require

14  analysis of the state court's method as well as its result.  Nunes v. Mueller, 350 F.3d 1045, 1054 (9th

15  Cir. 2003).

16      **B.**      **Section 2254(d)(2)**

17      A federal habeas court may grant a writ if it concludes a state court's adjudication of a claim

18  "resulted in a decision that was based on an unreasonable determination of the facts in light of the

19  evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2).  An unreasonable

20  determination of the facts occurs where the state court fails to consider and weigh highly probative,

21  relevant evidence, central to petitioner's claim, that was properly presented and made part of the

22  state court record.  Taylor v. Maddox, 366 F.3d 992, 1005 (9th Cir. 2004).  A district court must

23  presume correct any determination of a factual issue made by a state court unless the petitioner

24  rebuts the presumption of correctness by clear and convincing evidence.  28 U.S.C. § 2254(e)(1).

25      **C.**      **Exhaustion**

26      Prisoners in state custody who wish to challenge collaterally in federal habeas proceedings

27  either the fact or length of their confinement are required first to exhaust state judicial remedies,

28  either on direct appeal or through collateral proceedings, by presenting the highest state court

1   available with a fair opportunity to rule on the merits of each and every claim they seek to raise in

2   federal court.  See 28 U.S.C. § 2254(b), (c).  Petitioner's state court remedies were exhausted as his

3   claims were presented to and denied by the California Supreme Court.

4                                    **FACTUAL BACKGROUND**

5          Although Petitioner is not challenging the validity of his underlying criminal conviction, the

6   Board relied upon the following facts regarding the commitment offense to deny Petitioner parole in

7   2005.  The facts regarding the circumstances surrounding the murder of Carlos Perez were read into

8   the record at the hearing.  The Court includes that summary here:

9          [A]t approximately 10:00 p.m. on May 23, 1990, Mosby and Monty . . . went with
       Kenneth Barnes to the residence of Joseph Harris to sell drugs.  When Mosby and
10      Monty sold drugs, Monty handled the cocaine and Mosby handled the money.
       After Harris smoked some cocaine, the four men left the Harris residence and
11      headed to an adult bookstore.  Harris, Monty, and Mosby left in the defendant's
       white car. . . .  Harris overheard either the defendant and Monty say, "Let's go cap
12      a Mexican."  After spending some time in the bookstore and making short stops at
       Norm's restaurant . . . and a 7-Eleven Store, Harris, Monty and Mosby returned to
13      Harris' apartment building.  Barnes stayed at the bookstore.

14      The victim [Carlos Perez] was riding a bicycle in front of Harris' apartment
       building.  As he rode, he banged a golf club against fence slats.  Mosby and
15      Monty began arguing with the victim.  The victim called the two men a racial
       (indiscernible) and rode off.  After a few minutes, Mosby and Monty got into the -
16      - into Mosby's car and drove off in search of the victim.  After five minutes,
       Mosby and Monty returned and parked near Harris' apartment.  They had not seen
17      the victim.  Moments later, the victim returned riding a bicycle. . . .  Monty and
       the victim began to argue again.  The victim again rode off.  Monty stated, "We're
18      going to get him.  Let's go."  You know, in parentheses it says defendant.  I guess
       it should have said Mosby, you drive.  Mosby drove his white car.  Monty sat in
19      the passenger seat.  Mosby slowed down as he approached the victim.  Monty
       leaned out of the car over the hood and fired three shots directly at the victim.
20      One shot hit the victim in the abdomen near the navel, killing him.  After the
       shots were fired, the car accelerated, burning rubber. . . .

21

22      The gun which killed the victim was a .45 caliber.  Earlier that morning, Mosby
       had been seen with a military-style .45 caliber handgun.  Also that evening, a gun
23      had been seen under the (indiscernible) in Mosby's car.  Three .45 caliber casings
       from an automatic handgun were found at the scene.  The bullet found in the
24      victim was .45 caliber full-jacket, (indiscernible) military-bought ammunition,
       spent projectile.  During the investigation of the crime and after Mosby was read
25      his rights, he talked to police officers.  In this conversation, he admitted that he
       had been with Monty and Harris that evening near the crime scene.  He and his
26      mother earned [sic] a white car, which he had driven that evening.  The victim
       had threatened him and the other men with a golf club, racial (indiscernible),
27      obscenities, and gang hand signals; and he and Monty had left the area to find the
       victim but then returned when the victim could not be located.  Initially, Mosby
28      denied being present at the time the shooting had occurred.  Later in the
       discussion, he said that as he drove the vehicle, Monty had taken the gun and

fired at the victim.  He also admitted he'd seen Monty with a .45 caliber automatic handgun on prior occasions.  However, he explicitly denied (indiscernible) what he intended to do with the gun stating he had asked Monty to leave his car once he saw Monty with the weapon and he did not know Monty's full name (indiscernible) for much time.  The only defense witness was a toxicologist who testified the victim had a metabolite of cocaine in his system at the time of death.

(Am. Pet. Ex. A at 13-16.)

Alternatively, in the "Prisoner's Version" section of his Life Prisoner Evaluation Report, Petitioner states:

[O]n the night the commitment offense occurred, I did not know that Mr. Carlos Perez was going to be killed nor was that my intention. . . .  The events that occurred happened suddenly and I did not really know what was happening.  There is nothing I can say that will bring Mr. Carlos Perez back no matter how much I want to.  Although I was not the shooter of Mr. Perez, that does not absolve me from my own culpability.  I accept full responsibility for the death of Carlos Perez, because it was my own inaction that allowed Carlos to be killed on that terrible night!  I have never been around that kind of thing before.  I am deeply sorry for the pain, hurt and anger my inaction to prevent this crime has caused.  I sincerely apologize . . . .

(Am. Pet. Ex. C at 1-2.)

## DISCUSSION

As grounds for federal habeas relief, Petitioner asserts that the Board's denial of parole in 2005 was not supported by "some evidence" of current dangerousness, in violation of his right to due process.  (Am. Pet. at 6-A.)

## I.      Applicable Legal Standard

The Due Process Clause does not, by itself, entitle prisoners to release on parole in the absence of "some evidence" of their current dangerousness.  Hayward, 603 F.3d at 555, 561.  Under California law, however, "some evidence" of current dangerousness is required in order to deny parole.  Id. at 562 (citing In re Lawrence, 44 Cal. 4th 1181, 1205-06 (2008) and In re Shaputis, 44 Cal. 4th 1241 (2008)).  This requirement gives California prisoners a liberty interest protected by the federal constitutional guarantee of due process in release on parole in the absence of "some evidence" of their current dangerousness.  Cooke v. Solis, 606 F.3d 1206, 1207, 1213 (9th Cir. 2010) (citing Hayward, 603 F.3d at 561-64); Pearson v. Muntz, 606 F.3d 606, 608, 611 (9th Cir. May 24, 2010) (citing Hayward, 603 F.3d at 561-64).

When a federal habeas court in this circuit is faced with a claim by a California prisoner that

his or her right to due process was violated because the denial of parole was not supported by "some evidence," the court "need only decide whether the California judicial decision approving" the denial of parole "was an 'unreasonable application'[] of the California 'some evidence' requirement, or was 'based on an unreasonable determination of the facts in light of the evidence.'" Hayward, 603 F.3d at 562-63 (quoting 28 U.S.C. 2254(d)(1)-(2)); Cooke, F.3d 606 at 1214; Pearson, 606 F.3d at 609.

California's "some evidence" requirement was summarized in Hayward as follows:

> As a matter of California law, "the paramount consideration for both the Board [of Prison Terms] and the Governor under the governing statutes is whether the inmate currently poses a threat to public safety."

> There must be "some evidence" of such a threat, and an aggravated offense "does not, in every case, provide evidence that the inmate is a current threat to public safety." The prisoner's aggravated offense does not establish current dangerousness "unless the record also establishes that something in the prisoner's pre- or post- incarceration history, or his or her current demeanor and mental state" supports the inference of dangerousness. Thus, in California, the offense of conviction may be considered, but the consideration must address the determining factor, "a current threat to public safety."

Hayward, 603 F.3d at 562 (quoting Lawrence, 44 Cal. 4th. at 1191, 1210-14).

## II.    Parole for Murderers in California

California uses indeterminate sentences for most non-capital murderers, with the term being life imprisonment and parole eligibility after a certain minimum number of years. A first degree murder conviction yields a minimum term of twenty-five years to life and a second degree murder conviction yields a minimum term of fifteen years to life imprisonment. See In re Dannenberg, 34 Cal. 4th 1061, 1078 (2005); Cal. Penal Code § 190. The upshot of California's parole scheme described below is that a release date normally must be set unless certain factors exist, but the "unless" qualifier is so strict that parole is a rarity rather than the norm for murderers.

California Penal Code § 3041(a) states that the Board shall meet with an inmate one year before the prisoner's minimum eligible release date and shall normally set a parole release date. Penal Code § 3041(a).

> The release date shall be set in a manner that will provide uniform terms for offenses of similar gravity and magnitude in respect to their threat to the public, and that will comply with the sentencing rules that the Judicial Council may issue and any sentencing information relevant to the setting of parole release dates.

United States District Court
For the Northern District of California

Id.

Significantly, this statute also provides:

> The panel . . . shall set a release date unless it determines that the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration for this individual, and that a parole date, therefore cannot be fixed at this meeting.

Id. § 3041(b).

The California Code of Regulations contains a matrix of suggested base terms that is apparently the source of many prisoners' dashed hopes. The matrix provides three choices of suggested base terms for several categories of crimes. See Cal. Code Regs. tit. 15, § 2403. For second degree murders, the matrix of base terms ranges from a low of fifteen, sixteen or seventeen years, to a high of nineteen, twenty or twenty-one years, depending on certain facts of the crime.[1] Although the matrix is used to establish a base term, this occurs only once the prisoner has been found suitable for parole. See id. § 2403(a). Here, Petitioner has served about eighteen post-conviction years in prison.

The statutory scheme elevates a prisoner's suitability for parole above their expectancy in the early setting of a fixed date, which is designed to ensure term uniformity. In re Dannenberg, 34 Cal. 4th at 1070-71.

> While subdivision (a) of section 3041 states that indeterminate life (i.e., life-maximum) sentences should "normally" receive "uniform" parole dates for similar crimes, subdivision (b) provides that this policy applies "*unless* [the Board] determines" that a release date cannot presently be set because the particular offender's crime and/or criminal history raises "*public safety*" concerns requiring further indefinite incarceration. (Italics added.) Nothing in the statute states or suggests that the Board must evaluate the case under standards of term uniformity before exercising its authority to deny a parole date on the grounds the particular offender's criminality presents a *continuing public danger*.

Id. at 1070 (emphasis and brackets in original). Indeed, the very regulation that includes the matrix

---

[1] One axis of the matrix concerns the relationship between murderer and victim, and the other axis of the matrix concerns the circumstances of the murder. The choices on the axis for the relationship of murderer and victim are "participating victim," "prior relationship," and "no prior relationship." The choices on the axis for the circumstances of the murder are "indirect," "direct or victim contribution," or "severe trauma." Each of the choices is further defined in the matrix. See Code Regs. tit. 15, § 2403(c).

9

**United States District Court**
For the Northern District of California

states that "[t]he panel shall set a base term for each life prisoner *who is found suitable for parole*." Code Regs. tit. 15, § 2403(a) (emphasis added).  "[T]he Board, exercising its traditional broad discretion, may protect public safety *in each discrete case* by considering the dangerous implications of a life-maximum prisoner's crime individually."  In re Dannenberg, 34 Cal. 4th at 1071 (emphasis in original).  The California Supreme Court's determination of state law is binding in this federal habeas action.  See Hicks v. Feiock, 485 U.S. 624, 629 (1988); Sandstrom v. Montana, 442 U.S. 510, 516-17 (1979).

The California Supreme Court has also determined the facts of the crime alone may support a sentence longer than the statutory minimum, even if everything else about the prisoner is laudable.

> While the Board must point to factors beyond the minimum elements of the crime for which the inmate was committed, it need engage in no further comparative analysis before concluding that the particular facts of the offense make it unsafe, at that time, to fix a date for the prisoner's release.

In re Dannenberg, 34 Cal. 4th at 1071; see also In re Rosenkrantz, 29 Cal. 4th 616, 682-83 (2002) ("The nature of the prisoner's offense, alone, can constitute a sufficient basis for denying parole" but might violate due process "where no circumstances of the offense reasonably could be considered more aggravated or violent than the minimum necessary to sustain a conviction for that offense.").

The California Code of Regulations also sets out the factors showing suitability or unsuitability for parole that the Board is required to consider.  See Code Regs. tit. 15, § 2402(b). These include "[a]ll relevant, reliable information available," such as: the circumstances of the prisoner's social history; past and present mental state; past criminal history, including involvement in other criminal misconduct which is reliably documented; the base and other commitment offenses, including behavior before, during and after the crime; past and present attitude toward the crime; any conditions of treatment or control, including the use of special conditions under which the prisoner may safely be released to the community; and any other information which bears on the prisoner's suitability for release.  Id.  Circumstances which taken alone may not firmly establish unsuitability for parole may contribute to a pattern which results in finding of unsuitability.  Id.

Circumstances tending to show unsuitability for parole include the nature of the commitment offense and whether "[t]he prisoner committed the offense in an especially heinous, atrocious or

United States District Court
For the Northern District of California

cruel manner." Id. at (c).  This includes consideration of the number of victims, whether "[t]he offense was carried out in a dispassionate and calculated manner," whether the victim was "abused, defiled or mutilated during or after the offense," whether "[t]he offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering," and whether "[t]he motive for the crime is inexplicable or very trivial in relation to the offense." Id.  Other circumstances tending to show unsuitability for parole are a previous record of violence, an unstable social history, previous sadistic sexual offenses, a history of severe mental health problems related to the offense, and serious misconduct in prison or jail. Id.

Circumstances tending to support a finding of suitability for parole include no juvenile record, a stable social history, signs of remorse, that the crime was committed as a result of significant stress in the prisoner's life, a lack of criminal history, a reduced possibility of recidivism due to the prisoner's present age, that the prisoner has made realistic plans for release or has developed marketable skills that can be put to use upon release, and that the prisoner's institutional activities indicate an enhanced ability to function within the law upon release. Id. at (d).

## III.   Analysis

### A.   Parole Board Proceedings

At his 2005 parole suitability hearing, the Board considered Petitioner's individual circumstances tending to show parole suitability and unsuitability.  The Board considered Petitioner's central file and prior hearing transcripts in making its decision that Petitioner was unsuitable for parole.  Petitioner was to receive a subsequent parole hearing in three years.[2]

The Board stated that Petitioner "would pose an unreasonable risk of danger to society if released from prison."  (Am. Pet. Ex. A, Parole Decision Tr. at 1.)  The Board relied on the following factors as "some evidence" for denying Petitioner parole: (a) the commitment offense; (b) his lack of insight; (c) his unstable social history; (d) his need for further self-help and program

---

[2] At his January 7, 2009 parole hearing, the Board found Petitioner suitable for parole. Thereafter, the governor exercised his discretion and reversed the Board's decision.  Petitioner has filed another parole habeas petition challenging the governor's reversal.  See Mosby v. Grounds, Case No. C 10-1332 SBA (PR).  The Court will address that petition in a separate written Order.

11

United States District Court
For the Northern District of California

participation; and (e) the incomplete psychological record.

### 1.    The Commitment Offense

The Board first considered Petitioner's commitment offense.  (Id. at 1.)  It called the crime "certainly callous," stating,

> Mr. Perez may have gotten into a verbal altercation with Mr. Monty as was stated by Mr. Mosby, but he certainly didn't do anything that rose to the level of causing them to feel that they needed to hunt him down and shoot him.  And that's exactly what happened.  The motive for this crime is incredibly trivial in relation to this offense.

(Id. at 3.)  Petitioner concedes that the motive for the commitment offense was trivial.  (Traverse at 14.)  However, this alone does not establish "current dangerousness 'unless the record also establishes that something in the prisoner's pre- or post- incarceration history, or his or her current demeanor and mental state' supports the inference of dangerousness."  Hayward, 603 F.3d at 562 (quoting Lawrence, 44 Cal. 4th at 1191, 1210-14).  Petitioner further states, "the Board failed to articulate a rational nexus between the commitment offense and a finding that Petitioner was currently dangerous."  (Traverse at 14.)

The Court holds that Petitioner's commitment offense does not provide "some evidence" of his current dangerousness.  The Court now turns to other factors that may demonstrate Petitioner's current level of danger to society.

### 2.    Lack of Insight

The Board next focused on Petitioner's lack of insight into the commitment offense.  It determined that Petitioner "continues to minimize his participation in this crime and characterizes it as making some bad decisions and being guilty because he didn't stop the murder."  (Am. Pet. Ex. A, Parole Decision Tr. at 9.)  The Board also discredited Petitioner's claim that he did not know the victim would be killed:

> [Petitioner] says that it was his own action [sic] that caused this death and that if he knew the person that he was with that night had the potential to shoot and kill someone, he wouldn't have allowed himself to be in their company.  The appellate (indiscernible), however, states that -- and I'm reading verbatim now -- the gun that killed the victim was a .45 caliber.  Earlier that evening, the defendant had

United States District Court
For the Northern District of California

been seen with a military-style .45 caliber handgun.  Also that evening, the gun
had been seen under the seat of the defendant's car. . . .  [O]n the way to the
bookstore, Harris overheard either Mosby or Monty say let's cap a Mexican --
let's go cap a Mexican.  Coincidentally, Mr. Perez happened to be of Hispanic
descent.  There is every indication, in (indiscernible) this panel, that Mr. Mosby is
(indiscernible) minimizing his participation in this crime.

(Id. at 2-3.)

However, two psychologists who examined Petitioner in 2001 and 2002 came to very

different conclusions than the Board.  Dr. Bakeman's April 10, 2001 report found that Petitioner "is

able to think more maturely now and presumably will not be engaging in any criminal activities

upon his release.  I expect him to become a good citizen and to be dependable and responsible."

(Answer Ex. 2, Ex. I at 4.)  Likewise, Dr. Fishback's January 14, 2002 report states that Petitioner

has shown "appropriate remorse, and with recognition of pain to the victim's family."  (Id. at 7.)  Dr.

Fishback further writes, "Inmate Mosby appears to have shown an evolution of maturity in his work

history, in taking responsibility for, and understanding his crime, in the care in which he expresses

remorse, and in his self-care activities."  (Id. at 8.)

The Board did not credit Dr. Fishback's report that Petitioner had in fact developed insight,

stating:

There are various (indiscernible) where the panel disagrees with Dr. Fishback,
and I'm going to state them specifically for the record.  One of them is that Dr.
Fishback believes that -- or indicated that -- Mr. Mosby had developed
(indiscernible) insight into the crime and himself.  It is our feeling that Mr.
Mosby's characterization of his participation to the doctor by indicating that in his
instant offense he appeared to be at fault for not doing anything to stop the murder
from happening . . . rather than any violent act of his own making.  It is the
panel's belief that this indicates a lack of insight into his culpability and
participation in this crime. . . .  It does note that he believes that Mr. Mosby has
grown ethically, socially, and vocationally to a much more advanced level than
most other inmates; and I would have to disagree with that also.  Mr. Mosby has
certainly not gained insight into his own behaviors . . . .  I don't find that that's any
kind of growth.

(Am. Pet. Ex. A, Parole Decision Tr. at 5-6.)

Petitioner claims that the Board's discrediting of the psychological reports was "arbitrary and

capricious" and "an unreasonable determination of the facts in light of the evidence presented"

13

because the finding "contradicts the forensic evidence found by the state's own experts." (Traverse at 19.)

After a careful reading of the Board transcript and the psychological reports, the Court finds that the Board's evaluation of Petitioner's insight into the commitment offense is unreasonable and cannot constitute "some evidence" of current dangerousness. Petitioner's conduct during the Board hearing does not demonstrate any lack of insight into the commitment offense, a determination that is reinforced by two psychological reports. Indeed, in Petitioner's version of the commitment offense, which was cited by the Board, he says, "Although I was not the shooter of Mr. Perez, that does not absolve me from my own culpability. I accept full responsibility for the death of Carlos Perez, because it was my own inaction that allowed Carlos to be killed on that terrible night!" (Am. Pet. Ex. C at 1-2.) The Court finds that this statement accords with the official version of the crime and that Petitioner shows appropriate remorse insight into the events leading to the commitment offense.

In addition, the Board pointed to three specific examples demonstrating Petitioner's lack of insight and providing "some evidence" of his current dangerousness:

(a)    **Inappropriate Language**

In the first example, the Board asked Petitioner about a disciplinary memo, or CDC-128A, he received for calling a female correctional officer a bitch:

> PRESIDING COMMISSIONER FISHER: This female officer who said . . . that you called her a bitch, the way you responded to the question was that there were a lot of inmates in that area. Everybody was banging on their cells. She couldn't see who called her a bitch; but then when (indiscernible) for an answer, you said, well, the word bitch may have been used; but it wasn't said to her face.
>
> INMATE MOSBY: Right.
>
> PRESIDING COMMISSIONER FISHER: So did you say that she was a bitch?
>
> INMATE MOSBY: I didn't say it to her face, no.
>
> PRESIDING COMMISSIONER FISHER: Well, I meant -- that doesn't matter. That doesn't matter. Did you say she was a bitch?

INMATE MOSBY: What's -- yes, I did.

PRESIDING COMMISSIONER FISHER: So the question that she had for you was legitimate.  Whether you were saying it directly to her or not --

INMATE MOSBY: Well, (indiscernible) there was a crowd of people, and she came directly to me --

PRESIDING COMMISSIONER FISHER: Well, maybe --

INMATE MOSBY:  -- and it was said, but the reason why, I was trying to get to a visit and she wouldn't come open the door, and, you know, (indiscernible), you know, I was upset, you know?

PRESIDING COMMISSIONER FISHER: Okay.  But you still -- even right now -- you're still kind of dancing around the situation.

(Am. Pet. Ex. A, Parole Hr'g at 47-48.)  In its decision, the Board cited the above exchange, saying that "the protracted conversation we had today trying to get from him whether or not he actually called an officer an inappropriate name" was a main example of Petitioner's lack of insight because it demonstrated his attitude of "if somebody didn't see it and I can get away with it, then they don't know whether I did it or not."  (Am. Pet. Ex. A, Parole Decision Tr. at 6.)

The Court finds that the record does not reflect Petitioner's supposed lack of insight in this instance.  When confronted by the Board, Petitioner did not deny calling the officer an inappropriate name and was merely attempting to explain the circumstances surrounding the incident.  There could have been a misunderstanding between the Board and Petitioner; however, such a misunderstanding should not be confused with Petitioner's lack of insight.

**(b)      Prior Drug Use**

In another example of Petitioner's lack of insight, the Board objected to his description of prior drug use.  When Petitioner was first arrested for the commitment offense, he told the police he had a "serious meth problem."  (Am. Pet. Ex. A, Parole Hr'g at 46.)  At the Board  hearing, Petitioner denied having had a serious drug problem and explained that he had "exaggerated" his prior drug use, stating: "I'd never been to prison before.  I was scared . . . and I exaggerated a little about my

drug use, but it seems like the probation officer took it to the next level." (Id.)  Later, he explained that "someone told me while I was in county jail that if I told them I had a drug problem, I could get to CRC, which is like a lesser . . . prison." (Id. at 57.)  Petitioner further said that, in regard to

> [T]he substance abuse programs -- I wanted to make a statement in reference to that, because I feel that you're under the impression that I'm trying to escape that; and I take full responsibility for my past drug use; and I've been active in NA and doing anything I can to better myself.  And, you know, I've been clean for over 15 years.

(Id. at 61-62.)  Deputy District Attorney Frisco, appearing in opposition to Petitioner's parole, characterized this explanation as "tr[ying] to manipulate the system by exaggerating it so he can get into a better program." (Id. at 63.)  Although the Board appears to minimize the significance of Petitioner's explanations about his prior drug use in the Board's decision by saying that it "makes more sense to me" and is "certainly not the first time we've seen that," the Board nevertheless appears to rely on Petitioner's explanation as further evidence of his lack of insight.  (Am. Pet. Ex. A, Parole Hr'g at 47; Am. Pet. Ex. A, Parole Decision Tr. at 71.)

The Court objects to the Board's categorization of Petitioner's past drug use as evidence of his lack of insight.  As noted above, Petitioner takes "full responsibility" for his drug use and has remained drug-free since his incarceration.  In addition, any exaggerations Petitioner may have made occurred over fifteen years before the Board's decision and therefore cannot be used to show his current lack of insight.

### (c)   <u>False Identification</u>

In the final example of Petitioner's lack of insight, the Board cited his misdemeanor for giving false identification to a peace officer.  (Am. Pet. Ex. A, Parole Hr'g at 56.)  Petitioner plainly admitted to having done so, but later in the hearing he attempted to clarify by stating that he did not "give them false information.  It was a real name, it's just that my mother was married to somebody before; and I just used the other name." (Id. at 58-59.)  Deputy District Attorney Frisco characterized this exclamation as "splitting hairs," stating, "when [Petitioner] was asked about why he gave a false name, he says, well, I really didn't give a false name.  Well, what did you give?

16

Well, I gave the name of my mother's new husband. Well, that's a false name."[3] (Id. at 64.) The Board appears to have accepted Deputy District Attorney Frisco's version in its decision, noting that they "pretty much ha[d] to arm wrestle answers out of Mr. Mosby about his prior bad behavior." (Am. Pet. Ex. A, Parole Decision Tr. at 10.)

The Court finds that Petitioner was simply attempting to clarify what name he had given and that his explanation does not reflect a lack of insight. Neither the Board nor Deputy District Attorney Frisco have evidence that Petitioner never went by the name of his mother's husband. Petitioner's explanation involved neither "splitting hairs" or "arm wrestl[ing]." The Board transcript does not support an inference that Petitioner lacked insight on this issue.

### (d)    Conclusion

Because the hearing transcript and psychological records do not reflect that Petitioner lacked insight into the commitment offense, his disciplinary record while incarcerated, or his prior drug use or criminal record, the Court finds that Petitioner's lack of insight is not "some evidence" of his current level of dangerousness.

### 3.    Unstable Social History

The Board cited an "unstable social history," including "using drugs, selling drugs, and dropping out of high school," as a factor in denying Petitioner parole. (Id. at 4, 9.)

The California Code of Regulations provides that a prisoner's social history is a factor that may be considered in determining parole suitability. A factor tending to show unsuitability is that "[t]he prisoner has a history of unstable or tumultuous relationships with others." Code Regs. tit. 15, § 2402(c)(3). On the other hand, a factor tending to show suitability is "[t]he prisoner has experienced reasonably stable relationships with others." Id., § 2402(d)(2).

The record does not contain substantial evidence to support the Board's finding of parole unsuitability based on Petitioner's social history. In fact, his social history is mostly positive.

---

[3]  Deputy District Attorney Frisco incorrectly claims that Petitioner used the name of his mother's new husband. In fact, Petitioner used the name of his mother's prior husband.

**United States District Court**
For the Northern District of California

**United States District Court**
For the Northern District of California

1   According to Dr. Bakeman's 2001 psychological report, Petitioner has no "significant childhood

2   history of physical or sexual abuse as either a perpetrator or a victim."  (Answer Ex. 2, Ex. I at 1.)

3   Petitioner reports that he "had a good upbringing. [His] family raised [him].  [He] went to private

4   school most of [his] life."  (Am. Pet. Ex. A, Parole Hr'g at 21.)  Petitioner has also received

5   numerous letters in support of his parole, including ones from his wife, mother, grandparents, and

6   aunt, indicating that he has maintained close relationships with his family while incarcerated.  (Am.

7   Pet. Ex. E, App. 8 at 1, 6-11.)  He can live with his mother after he is paroled.  (Am. Pet. Ex. A,

8   Parole Hr'g at 60.)  In particular, he reports being close with his daughter, who was born shortly

9   before the commitment offense took place.  (Id. at 19; Am. Pet. Ex. E, App. 8, Letters in Support of

10  Parole, at 1, 6-11.)  On April 2, 2005, he got married.  (Am. Pet. Ex. A, Parole Hr'g at 28-29.)

11       The examples that the Board cites do not fall under the category of "unstable or tumultuous

12  relationships with others."  See Code Regs., tit. 15, § 2402(b).  There is no evidence in the record

13  that his drug use or sales or his failure to complete high school affected his relationship with others

14  in any way.  (Am. Pet. Ex. A, Parole Hr'g at 19.)  Therefore, Petitioner's social history cannot

15  constitute "some evidence" of his current dangerousness.

16       **4.       Further Self-Help and Program Participation**

17       The Board also denied Petitioner a parole date for his "fail[ure] to upgrade educationally or

18  vocationally."  (Am. Pet. Ex. A, Parole Decision Tr. at 4.)  Petitioner has "programmed in a limited

19  manner while he's been incarcerated" and "has not participated in beneficial self-help at this time."

20  (Id. at 4-5.)  The Board told Petitioner to "complete a vocation, to complete a GED, to spend a

21  longer period of time in substance abuse programming, and to continue to participate in self-help."

22  (Id. at 10.)

23       Petitioner objects to this characterization of his program participation while incarcerated.

24  (Traverse at 21.)  Petitioner claims he "has engaged in vocational training and has received a

25  certificate in vocational Computer Related technology."  (Id.)  He has "also participated in

26

27

28

**United States District Court**
For the Northern District of California

vocational Computer repair" and "made efforts at obtaining his GED."[4]  (Id.)  He claims to have "other marketable skills he has learned while incarcerated such a [sic] being a skilled maintenance warehouseman and clerk."  (Id. at 23.)  Petitioner claims to have completed many educational and self-help courses, including anger management, Alcoholics Anonymous, Narcotics Anonymous, Fatherhood and Beyond, and STI and HIV/AIDS treatment courses.  (Id.)  He also lists several commendable philanthropic activities, including assisting in the Children's Holiday Festival and raising money for various charities through the Men's Advisory Counsel, work for which he was awarded the Warden's Community Service Award in 2001.  (Id. at 24.)

The record makes clear that Petitioner has done extremely well in his workplace, educational, and volunteer pursuits while in prison.  The Court finds that it was not reasonable for the Board to deny Petitioner parole based on his self-help and program participation.

### 5.    Incomplete Psychological Records

Finally, the Board noted that Petitioner's psychological records were incomplete. As mentioned above, there were two psychologists who examined Petitioner.   Dr. Bakeman's 2001 report did not contain a complete assessment of his level of dangerousness, necessitating Dr. Fishback's addendum in 2002.  (Answer Ex. 2, Ex. I at 5.)  However, Dr. Fishback was not able to fully complete the interview and therefore his evaluation was also incomplete.  (Id. at 7.)  Dr. Fishback noted:

> Inmate Mosby chose to terminate this psychological interview with this evaluator in 12/01, noting that, "If you are going to do this [questioning of inmate's substance abuse history] again, then I'll terminate it. . . .  I don't want to deal with it.  My rights need to be protected . . . my lawyer wanted a clarification about my potential violence on the street, which was not in the [original] report . . . ."  The above reply was made appropriately without anger, and did not appear negative at all.

(Id. at 7-8.)  Because the interview was terminated early, Dr. Fishback was not able to evaluate the

---

[4] In Petitioner's 2005 hearing, the Board noted that he had trouble with the mathematics portion of the GED.  (Am. Pet. Ex. A, Parole Hr'g at 41-44.)  He stated, "I guess I've got a fear of math. . . . I've never been able to deal with it."  (Id.)  As was made clear in Petitioner's 2009 Board hearing granting him parole, he suffers from dyscalculia, "a disability I have with math and symbols," preventing him from obtaining his GED.  (Traverse Ex. 1 at 7.)

**United States District Court**
For the Northern District of California

1  following factors he would have used in determining Petitioner's overall level of dangerousness:

2  plans lack feasibility; exposure to destabilizers; lack of personal support; and stress.  (Id. at 9.)  Dr.

3  Fishback concluded, "given the above dangerousness criteria that <u>could</u> be evaluated, it is the

4  opinion of this evaluator that inmate Mosby's risk level is low, compared to other citizens on the

5  street, but only if he does not associate with those of poor judgment or criminal intent."  (Id.)

6       At the Board hearing, Petitioner's attorney explained, "The panel had ordered specific

7  information to be obtained, and it appears from reading the documents that the psychologist was

8  going beyond what reasonably Mr. Mosby believed the inquiry should involve."  (Am. Pet. Ex. A,

9  Parole Hr'g at 65.)  Dr. Fishback also noted that Petitioner's decision to terminate the examination

10  early "was made appropriately, without anger, and did not appear negative at all. . . . [I]nmate

11  Mosby's attitudes appear to have been generally quite positive and mature over his years of

12  imprisonment."  (Answer Ex. 2, Ex. I at 8.)

13       Despite these explanations, the Court finds that neither psychological report adequately

14  addresses Petitioner's level of dangerousness in the community compared to the average citizen.

15  The Court is also concerned that both of Petitioner's incomplete psychological evaluations took

16  place over three years before the Board hearing and that the evaluations are today almost ten years

17  old.  Therefore, it was not unreasonable for the Board to rely on the incomplete psychological

18  records as "some evidence" of Petitioner's current dangerousness and to deny parole on that ground.

19       **6.    <u>Conclusion</u>**

20

21       Despite examining the factors of suitability that would support parole, including Petitioner's

22  "good family support" and "an offer of a job at a family-owned school," the Board found that these

23  factors did not outweigh Petitioner's factors of unsuitability.  (Am. Pet. Ex. A, Parole Decision Tr. at

24  5.)  The Board did note with approval that Petitioner has "absolutely no 115 disciplinaries while he's

25  been incarcerated for this crime."  (Id.)  It concluded by recommending that Petitioner "continue to

26  participate in self-help in order to face, discuss, and understand his own behaviors, the factors that

27  led to this commitment offense."  (Id. at 8.)  Although the Court finds that many of the factors the

28  Board relied upon are not "some evidence" of current dangerousness, Petitioner's incomplete

United States District Court
For the Northern District of California

1    psychological record does constitute "some evidence" that Petitioner may pose danger to society if

2    released on parole.

     **B.**   **Superior Court Denial**

3

4        On February 14, 2007, the superior court rejected Petitioner's writ, finding "'some evidence'

5    to support the Board's findings that the motive for the crime was very trivial in relation to the

6    offense." (Am. Pet. Ex. B at 1.)  The court also cited additional factors, including "petitioner's lack

7    of insight indicating that he does not understand the nature and magnitude of his crime," his

8    "minimization of his culpability and participation in the crime and his evasiveness in answering their

9    question." (Id.)  The court noted "petitioner's limited programming, insufficient self-help and failure

10   to complete a vocational [sic] and upgrade educationally -- activities that would indicate an

11   enhanced ability to function within the law upon release." (Id.)  Finally, the court noted that "the

12   Board found petitioner's most recent psychological report to be inconclusive regarding petitioner's

13   risk of dangerousness because the evaluation was incomplete due to the fact that petitioner

14   terminated his psychological evaluation interview early." (Id. at 2.)

15

     **C.**   **Appellate Court Denial**

16

17       On April 11, 2007, the Court of Appeals denied Petitioner's state habeas decision, holding

18   that there "appears to be 'some evidence' in support of the decision." (Am. Pet. Ex. D at 1.)  The

19   court also rejected Petitioner's claims of bias, a no-parole policy, ineffective assistance of counsel,

20   and violations of his equal protection or due process rights. (Id.)

21       Because the state appellate court's decision is the last reasoned decision regarding Petitioner's

22   challenge to the Board's parole denial, it is this decision which the Court reviews under 28 U.S.C.

23   § 2254(d).  See Ylst v. Nunnemaker, 501 U.S. 797, 803-04 (1991); Barker v. Fleming, 423 F.3d

24   1085, 1091-92 (9th Cir. 2005), cert. denied, 547 U.S. 1138 (2006).  Additionally, "[i]nsofar as the

25   state appellate court adopted the reasoning of the state [superior] court," the Court also considers the

26   superior court's decision.  DeWeaver v. Runnels, 556 F.3d 995, 997 (9th Cir. 2009) (citing Taylor,

27   366 F.3d at 999 n.5).  Here, because the appellate court's decision adopts the superior court's

28   identification of "some evidence," the Court will also look to the superior court's decision.  See id.

1    Contrary to Petitioner's arguments, the record shows that the Board's findings, as well as

2    those of the state superior and appellate courts, were supported by "some evidence."  Although the

3    Court rejects many of these findings, including the commitment offense, Petitioner's lack of insight,

4    unstable social history, and insufficient programming and self-help, it concludes that the incomplete

5    psychological record was a sufficient ground for the Board and the state courts' decision.  The

6    records show that the Board conducted a thorough review and consideration of Petitioner's

7    individual factors tending to show unsuitability and suitability for parole.  Indeed, the Board

8    recognized and commended Petitioner's complete lack of violence while incarcerated for the

9    commitment offense.  Nevertheless, it found that Petitioner was not yet suitable for parole because

10   "the positive aspects of behavior do not outweigh the factors of unsuitability" and the state appellate

11   court upheld this determination.  (Am. Pet. Ex. A, Parole Decision Tr. at 8.)

12   Having reviewed the facts of the crime as recited by the Board and the state courts as well as

13   the reasons stated for finding Petitioner ineligible for parole, the Court finds there was some

14   evidence" of his current dangerousness in the record to support the Board's decision.  The Court

15   concludes that the appellate court's decision to uphold the Board's parole suitability finding was not

16   based on an unreasonable determination of the facts in light of the evidence presented in the state

17   court proceeding, nor was it contrary to, or an unreasonable application of, clearly established

18   federal law.  28 U.S.C. § 2254(d)(1)-(2).  Accordingly, Petitioner's due process challenge to the

19   Board's parole decision is DENIED.

20   **CERTIFICATE OF APPEALABILITY**

21

22   Rule 11(a) of the Rules Governing Section 2254 Cases now requires a district court to rule

23   on whether a petitioner is entitled to a certificate of appealability in the same order in which the

24   petition is denied.  See Rule 11(a) of the Rules Governing § 2254 Cases, 28 U.S.C. foll. § 2254

25   (requiring district court to rule on certificate of appealability in same order that denies petition).

26   Here, the Court finds that Petitioner has made a sufficient showing that reasonable jurists could find

27   a denial of a constitutional right in regard to the claim that his due process rights were violated by

28   the denial of parole by the Board.  Slack v. McDaniel, 529 U.S. 473, 484 (2000).  Consequently, a

1   certificate of appealability is GRANTED.

2                                    **CONCLUSION**

3        For the foregoing reasons, the petition for a writ of habeas corpus is DENIED.  The

4   certificate of appealability is GRANTED.  The Clerk of the Court shall enter judgment and close the

5   file.

6        IT IS SO ORDERED.

7

8   DATED: 9/1/10

9                                           SAUNDRA BROWN ARMSTRONG

                                            United States District Judge

UNITED STATES DISTRICT COURT

FOR THE

NORTHERN DISTRICT OF CALIFORNIA

VINCENT MOSBY,

                Plaintiff,

   v.

ANTHONY P KANE et al,

                Defendant.

_____/

Case Number: CV07-04216 SBA

**CERTIFICATE OF SERVICE**

I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District Court, Northern District of California.

That on September 2, 2010, I SERVED a true and correct copy(ies) of the attached, by placing said copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office delivery receptacle located in the Clerk's office.

Vincent A. Mosby H29851

CTF-Soledad

P.O. Box 689 F-241-L

Soledad, CA 93960-0689

Dated: September 2, 2010

Richard W. Wieking, Clerk
By: LISA R CLARK, Deputy Clerk

G:\PRO-SE\SBA\HC.07\Mosby4216.denyHC.wpd   24